NL INDUSTRIES, INC., Plaintiff,

v.

GULF & WESTERN INDUSTRIES, INC., a Delaware Corporation; Gulf & Western Manufacturing Company, a Delaware Corporation Licensed to do Business in the State of Kansas Until October 24, 1983, a/k/a Taylor Forge Engineering [or Engineered] Systems Division—Gulf & Western Industries; Gulf & Western Manufacturing Company, a Delaware Corporation Licensed to do Business in the State of Kansas From and After October 24, 1983, a/k/a Taylor Engineering [or Engineered] Systems Division—Gulf & Western Industries; Taylor Forge Engineered Systems, Inc., a Kansas Corporation, a/k/a Taylor Forge Engineered Systems Division—Gulf & Western Industries; Wickes Manufacturing Company, Inc., A Delaware Corporation; T.F. Holding's, Inc., a Delaware Corporation; Mario Willars, an Individual; and William Bossart, an Individual, Defendants.

No. 85–6039–K.

United States District Court, D. Kansas.

Aug. 7, 1986.

Alvin D. Herrington, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., and Law Offices of Peter W. Cavette, Los Angeles, Cal., for plaintiff.

Ronald C. Newman, Mustain & Newman, Kansas City, Kan., and H. Fred Northcraft, Woody Schlosser, Smith, Gill, Fisher & Butts, Kansas City, Mo., Mario Willars, Katy, Tex., William Bossart, Tomball, Tex., for Gulf & Western Industries, Inc., Gulf & Western Mfg. Co., Wickes Mfg. Co., Inc.

Joel Poole, Polsinelli, White & Vardeman, Kansas City, Mo., for Taylor Forge Engi-

neered Systems, Inc. and T.F. Holding's, Inc.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case is before the court on various motions to dismiss. Individual defendants William Bossart and Mario Willars have moved the court to dismiss them pursuant to Rule 12(b)(2) for lack of personal jurisdiction. Defendants Gulf & Western Industries, Inc., Gulf & Western Manufacturing, Inc., Wickes Manufacturing Co., Inc., Taylor Forge Engineered Systems, Inc., and T.F. Holdings, Inc. (collectively "Gulf & Western") have moved the court, pursuant to Rule 12(b)(6), to dismiss the complaint against them in its entirety for failure to state a claim upon which relief can be granted.

This case involves an alleged scheme of commercial bribery and price-fixing resulting in harm to NL's manufacturing plant in Houston, Texas. Plaintiff claims Gulf & Western bribed NL's Houston plant manager, Mario Willars, thereby inducing him to enter purchase contracts on behalf of NL with Gulf & Western. The contracts were for various supplies utilized by NL in manufacturing off-shore drilling equipment, and totaled millions of dollars. Subsequently, one of Gulf & Western's employees who was allegedly involved in the bribery—William Bossart—left Gulf & Western to work for a company in the same business, Johnson Controls. Through Bossart's actions, Gulf & Western and Johnson Controls allegedly entered identical purchase contracts with NL and then devised a scheme to fix the prices.

All of the alleged activities occurred in 1981. In 1982, NL cancelled the purchase contracts. On November 18, 1985, NL brought suit in this court against Mario Willars, William Bossart, and Gulf & Western. NL's complaint sets forth 13 counts: (1) tortious interference with business, contractual and fiduciary relations; (2) commercial bribery pursuant to § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c); (3) fraud and misrepresentation; (4) illegal restraint of trade under Kansas law; (5) restraint of trade under the Sherman Act, 15 U.S.C. §§ 1, 15; (6) violations of RICO, 18 U.S.C. § 1961 et seq.; (7) commercial bribery under Kansas law; (8) deceptive commercial practices under Kansas law; (9) deceptive trade practices under Texas law; (10) breach of the implied covenant of good faith; (11) breach of contractual agreement and fiduciary duties [asserted only against defendant Willars]; (12) civil conspiracy; and (13) misappropriation of trade secrets.

Defendants Willars and Bossart are both Texas residents. Further, they both resided in Texas during all times relevant to this lawsuit. They have each moved for dismissal due to lack of personal jurisdiction. For reasons set forth in the final portion of this order, their motions will be granted.

Gulf and Western has moved for dismissal of the complaint against them. Gulf & Western asserts the statute of limitations bars all claims except for the fraud claim, but that plaintiff has failed to state a claim for fraud. Gulf & Western also contends the plaintiff has failed to state claims for violations of the Robinson-Patman Act, RICO, Kansas penal statutes (commercial bribery, deceptive trade practices, civil conspiracy), the implied covenant of good faith, the Texas Consumer Protection Act, and misappropriation of trade secrets. As set forth herein, the court finds the plaintiff has failed to state claims for violation of the Robinson-Patman Act, RICO, commercial bribery, deceptive trade practices under Kansas or Texas law, civil conspiracy, fraud, and misappropriation of trade secrets. The plaintiff is given leave to amend its claims for fraud and misappropriation of trade secrets. The plaintiff is further given leave to amend to allege grounds for tolling the statute of limitations, which has otherwise run on the remainder of the claims.

### I. *Facts*

In 1981, NL Industries, Inc. (NL) was one of the nation's largest manufacturers and suppliers of equipment and services for

the petroleum industry. NL's principal place of business is in New York, where its stock is publicly traded on the New York Stock Exchange. NL Shaffer is a division of NL Industries which manufactures and sells various specialized oilfield equipment for use in on-shore and off-shore drilling operations. One of NL Shaffer's manufacturing plants is located in Houston, Texas. It is this division of NL that was involved in the transactions concerned in this lawsuit.

Among the products purchased by NL for use in its Houston plant are air pressure vessels (bottles filled with compressed air which is used in equipment manufactured by NL to stabilize off-shore drilling rigs), metal castings or "sheaves", and "accumulators" and "chain guards or chain wheel guides".

In or about June, 1981, NL entered into a contract with Gulf & Western for the purchase of "sheaves"; in July, 1981, NL entered into a contract with Gulf & Western for the purchase of "accumulators"; and in September, 1981, NL entered into a contract with Gulf & Western for the purchase of "chain guards or chain wheel guides".

The complaint alleges that these orders were secured by Gulf & Western through the influence of a woman named Eulalia "Wissie" Treesh, a low level Gulf & Western employee in Houston who was allegedly the mistress of Mario Willars, the plant manager for NL in Houston. Ms. Treesh was allegedly hired because of her "connection" with Willars. Plaintiff makes no allegation that the contracts were at an "inflated price." Rather, plaintiff alleges Willars did not act in accordance with the NL Shaffer purchasing policies in entering the purchase contracts.

When Willars became plant manager of the Houston plant in 1981, he personally took charge of the selection, negotiation and placement of orders for air pressure vessels. According to plaintiff "the contracts for [air pressure vessels] were highly valued since NL historically was a large producer of motion compensation equipment and such contracts could easily run into the millions of dollars." Under Willars' direction, NL discontinued ordering air pressure vessels from its traditional suppliers and began placing orders with Gulf & Western's Kansas division—Taylor Forge—at the request of Ms. Treesh and co-defendant William Bossart, who was a salesman for Taylor Forge in Houston. In July, 1981, NL issued a purchase order with Taylor Forge for 12 air pressure vessels at a unit price of $15,343.00. In August, 1981, NL issued another purchase order with Taylor Forge for 12 units at the same price. Later in August, 1981, NL increased its order to 92 air pressure vessels. Plaintiff claims these prices were "substantially in excess of the prices paid to NL's traditional suppliers."

In September, 1981, Bossart, who had represented Gulf & Western (Taylor Forge) in the sales of the vessels to NL, left Gulf & Western's employ and went to work as a sales representative of the same product line for Johnson Controls. Following Bossart's move to Johnson Controls, Willars made it known to both Gulf & Western and Johnson Controls that NL in Houston would be ordering specified air pressure vessels, and submitted "trade secret documents, drawings and design data" of NL to Johnson Controls and Gulf & Western.

Plaintiff then alleges that at unspecified times "representatives of Gulf & Western and Johnson Controls regularly communicated by phone or by mail or in person" regarding their dealings with NL. Plaintiff alleges that on "information and belief" Gulf & Western and Johnson Controls "fixed prices for [air pressure vessels], or allocated, or attempted to allocate, NL business between them." (Complaint, ¶ 21.) Plaintiff further alleges that the bids received from Gulf & Western and Johnson Controls were "substantially the same" and "significantly more" than bids from "past vendors...." (Complaint, ¶ 20.) Willars allegedly signed purchase orders for the same number of air pressure vessels from both Gulf & Western and Johnson Controls at the same approximate time.

Plaintiff alleges further that prior to signing the purchase contracts for the air pressure vessels, Mr. Willars was "escorted" to Las Vegas in November, 1981 by Mr. Bossart, Ms. Treesh, and Mr. Bossart's secretary. "NL was informed and believes that such conduct was undertaken to take advantage of Mr. Willars' gambling habit so as to allocate the orders for the bottles in question between Gulf & Western and Johnson Controls." NL was not informed of this "transaction". (Complaint, ¶ 23.)

Plaintiff further states that "on information and belief" Gulf & Western, along with other unnamed "co-conspirators", supplied Willars with "other items of value, including other trips to Las Vegas and Atlantic City for gambling." (Complaint, ¶ 24.)

Although not part of the complaint, these additional facts are relevant:

During 1982, NL unilaterally cancelled the great preponderance of the unfilled purchase orders it had placed during 1981 with Gulf & Western and Johnson Controls (presumably due to the slowdown in the oil industry). Cancellation charges were billed to NL under the terms of the contracts.

In 1984, after attempting unsuccessful negotiations, Johnson Controls sued NL in federal court in California to collect the cancellation charges and other damages. In April, 1985, NL amended its answer to assert 10 counterclaims which were closely aligned to NL's assertions herein. Seven of the 10 claims were dismissed with prejudice by the California court. The Johnson Controls case has now been settled.

A. *Gulf & Western's Motions to Dismiss for Failure to State a Claim Under 12(b)(6)*

The court may not dismiss plaintiff's complaint for failure to state a claim unless it appears beyond doubt that no set of facts can be proven upon which the plaintiff would be entitled to relief. *Ellis v. El Paso Natural Gas Company*, 754 F.2d 884 (10th Cir.1985). In considering a motion to dismiss, the factual allegations of the complaint must be accepted as true and all

reasonable inferences indulged in favor of the plaintiff. *Mitchell v. King*, 537 F.2d 385 (10th Cir.1976). Motions to dismiss are generally viewed with disfavor. 5 Wright & Miller, Federal Practice and Procedure § 1357.

1. *Count Two—Robinson-Patman Act*

In Count Two of the complaint, plaintiff alleges that defendants violated § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), by paying bribes to plaintiff's sales agent, Mario Willars, in order to obtain contracts with NL for the sale of goods at inflated prices. NL claims to have suffered damages by being placed at a "competitive disadvantage by paying inflated prices for the products it contracted for." Gulf & Western moves for dismissal, claiming plaintiff lacks standing because: (a) plaintiff has failed to allege a "competitive injury" of the type Congress intended to prevent in enacting § 2(c), and even if it had, (b) there is no causal relationship between the alleged commercial bribery and any competitive injury to the plaintiff.

Section 2(c) of the Robinson-Patman Act states as follows:

(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such direct or indirect control of any party to such transaction other than the person by whom such compensation is so granted or paid.

For purposes of this motion, the court must accept plaintiff's allegations in the complaint as true. Therefore, the court must assume the truth of the allegation that illegal compensation was awarded to

Mario Willars by the defendants in order to obtain purchase contracts with NL.

 It has been clearly established that commercial bribery may constitute a violation of § 2(c). *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir.1979); *Grace v. E.J. Kozin*, 538 F.2d 170, 173 (7th Cir.1976); *Rangen, Inc. v. Sterling Nelson & Sons*, 351 F.2d 851, 858 (9th Cir.1965). However, a plaintiff, to successfully invoke § 2(c), must allege some competitive injury of the type which the Robinson-Patman Act was designed to protect against. The absence of competitive injury is fatal to an antitrust claim. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (court held that recovery is limited to those plaintiffs who can allege and prove *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.") Although the exact boundaries of the "target area" may be the subject of much dispute, the purpose of this requirement is to limit recovery under antitrust to those entities whom the laws were meant to protect. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467 (10th Cir.1985), *cert. denied* ── U.S. ──, 106 S.Ct. 77, 88 L.Ed.2d 63 (1986).

The general view is that Congress' intent in enacting § 2(c) was to prevent disguised price discrimination. *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 25 (1st Cir.1981); *Howell Industries, Inc. v. Shawn Steel Corp.*, 532 F.Supp. 400, 406 (E.D.Mich.1981). However, in *Bunker Ramo Corp. v. Cywan*, 511 F.Supp. 531 (N.D.Ill.1981) a case closely aligned to the one at bar, the court took a restrictive view of the "target area" intended under § 2(c), stating:

As envisioned by Congress and interpreted by the courts, section 2(c) is designed to protect and promote competition among businesses competing at the same functional level in the marketing chain. Such competition should be based upon the price and quality of the goods rather than upon the ability of the buyer or seller to extract or pay, as the case may be, a commission or other compensation to one party or his agent in exchange for favorable treatment.... Thus, while a company may be injured when a supplier bribes an employee of that company in order to make a sale, the purchaser's injury is not cognizable under the antitrust laws since it is not a "competitive injury" within the meaning of the statutory framework. Rather, it is the supplier's competitors who have suffered competitive injury as a consequence of the bribe and it is they who have standing to sue under the antitrust scheme.

511 F.Supp. at 533 (citations omitted).

In *Bunker*, the defendant bribed plaintiff's agent to falsify purchase orders, delivery receipts and invoices for business forms which the plaintiff company paid for but never received. Therefore, the only injury to the plaintiff company was the direct financial loss caused by paying for goods it did not receive. Any competitive injury was clearly to the defendant's competitors, not the plaintiff who did not compete "in any sense of the term" with the defendant.

In this case, NL is not in competition with Gulf & Western. However, plaintiff argues in its motion opposing dismissal that it suffered an indirect *competitive* injury "as a result of the compensation equipment contracts it lost after having to pass along the inflated prices of the air pressure vessel component in bids to its customers." In plaintiff's complaint, it alleged only that it was "placed at a competitive disadvantage," but does not say "with whom." Such an allegation of an indirect competitive injury was not before the court in *Bunker*. Nevertheless, the *Bunker* court did explicitly state that a "competi-

tive injury" under § 2(c) is suffered *only* by the briber/supplier's competitors. Therefore, it follows that even if the plaintiff in *Bunker* had alleged that the defendant's acts caused it to be at a competitive disadvantage with its [plaintiff's] competitors, the court would have found that plaintiff suffered no "antitrust injury" under § 2(c). However, *Bunker*'s definition of "competitive injury" is more restrictive than that used by other courts which have considered § 2(c)'s application to commercial bribe situations.

In both *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, and *Computer Statistics, Inc. v. Blair*, 418 F.Supp. 1339 (S.D.Tex.1976), the courts opined that competitors of either the buyer (bribee) or seller (briber) could sue under § 2(c).

At least one court has gone even further and held that § 2(c) is not limited to the protection of competition. In *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F.Supp. 633 (D.Alaska 1982), the court found that not only the protection of competition, but "preserving the fiduciary relationship between a broker and his client," were within the congressionally intended target area of § 2(c). Accordingly, the court declined to follow the dicta of *Bunker, George Sales*, or *Computer Statistics* that a plaintiff who cannot show a "competitive injury lacks standing to complain about [bribes] although they literally fit within the language of the statute," and held "when commercial bribes are paid to a company's employees to obtain contracts for the sale of goods, the company has standing to bring an action for damages under § 2(c) of the Robinson-Patman Act." 547 F.Supp. at 633.

■ In this court's view, the definition of "competitive injury" in *Hitachi* is overly broad. A better approach is to find a plaintiff has standing under § 2(c) only if he can show *some* competitive injury, but not necessarily that he is in direct competition with the bribing seller. Under a liberal reading of the complaint herein, NL has alleged it was at a competitive disadvantage with its competitors due to having paid in excess for the air pressure vessels. This interpretation of "competitive injury" is on line with *George Sales* and *Computer Statistics. See also Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. at 488, 97 S.Ct. at 697 ("the antitrust laws were enacted for the protection of *competition*, not *competitors.*").

However, even though the plaintiff may have alleged it was at a competitive disadvantage with its competitors, the complaint fails to state that the "too high" prices of the air pressure vessels were caused by the bribery. Therefore, plaintiff's complaint—on its face—fails to establish a nexus between the alleged commercial bribery and the competitive injury. The complaint instead sets forth that the inflated price of the air pressure vessels was due to the "price-fixing agreement" between Johnson Controls and Gulf & Western. In ¶ 26 of the complaint plaintiff alleges, "on information and belief, the orders placed with Gulf & Western for the motion compensation bottles were not only the result of improper inducement of an NL employee, but it was at a price and for an amount which resulted from Gulf & Western's tacit understanding and agreement from Johnson Controls...." Also, the contracts for the sheaves, accumulators and chain guards are not alleged to have been at an inflated price. (Complaint, ¶¶ 12, 13 & 14.)

■ In order to have standing in an antitrust case, plaintiff must establish a "physical and economic nexus" between the alleged violation and the harm to plaintiff. *Blue Shield of Virginia v. McCready*, 457 U.S. at 478, 102 S.Ct. at 2547. *See also Associated Gen. Contractors v. Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983) ("the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."). The analysis is similar to a proximate cause inquiry in tort law. *Haff v. Jewelmont Corp.*, 594 F.Supp. 1468, 1471 (N.D.Cal. 1984); *George Sales*, 587 F.2d at 270 ("plaintiff must prove an injury to his busi-

ness *resulting from* the defendant's wrongful acts.").

■ Therefore, in this case even though the injury to competition among a bribed buyer's competitors may be an injury cognizable under § 2(c) of the Robinson-Patman Act, the plaintiff has failed to allege its injury was caused by the alleged bribery, but rather, has specifically alleged that it was caused by price-fixing. The defendants ask the court to take judicial notice that in the *Johnson Controls* case in the U.S. District Court of California, Judge Hatter dismissed the Robinson-Patman Act claim because the plaintiff failed to establish a nexus between any competitive injury and the alleged bribery. Since the plaintiff has met with this problem previously, it seems that if plaintiff could allege that any inflated prices of the air pressure vessels were caused other than by a price-fixing agreement, it would have done so.

As plaintiff has failed to establish a nexus between the alleged antitrust violation and the competitive injury, plaintiff lacks standing to bring this claim. Accordingly, the Robinson-Patman Act claim must be dismissed.

**B.** *Count Six—RICO*

In Count Six of the complaint, plaintiff alleges defendants' acts amount to RICO violations, 18 U.S.C. § 1961 *et seq.* Plaintiff has asserted that defendants' acts violated each of § 1962's prohibited activities. Specifically, plaintiff alleges the defendants, as persons, (a) used proceeds acquired through a "pattern of racketeering activity" to acquire, maintain, or control an "enterprise" (§ 1962(a)); (b) acquired, maintained, or controlled an enterprise through a "pattern of racketeering activity" (§ 1962(b)); (c) conducted or participated in the affairs of an enterprise through a "pattern of racketeering activity" (§ 1962(c)); and (d) conspired to do all of the above (§ 1962(d)). Plaintiff alleges that the predicate acts of racketeering activity in which the defendants engaged include: (a) commercial bribery in violation of Kansas law, K.S.A. 21–4405; (b) violations of the Mann

Act, 18 U.S.C. § 2421; (c) violations of the Travel Act, 18 U.S.C. § 1952; and (d) mail and wire fraud, 18 U.S.C. §§ 1341 and 1343. Plaintiff alleges that the above acts occurred within a 10–year period, thus constituting a "pattern" under § 1961(5). NL further claims it was injured in its business by the alleged violations.

Gulf & Western has moved to dismiss the entirety of the RICO claim.

The court finds plaintiff's allegations fail to state a RICO claim for the following reasons: (1) the predicate acts do not form a "pattern"; (2) plaintiff has failed to state a claim under §§ 1962(a), (b) or (d); and (3) plaintiff has failed to allege an "enterprise" separate from the "person" under § 1962(c).

**1.** *Racketeering Activity*

In establishing a RICO claim, a plaintiff must first allege that some racketeering activity has occurred. Section 1961(1) defines "racketeering activity" as:

(A) any act or threat involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year;

(B) any act which is indictable under the following provisions of Title 18, United States Code: ... section 1341 (relating to mail fraud); section 1343 (relating to wire fraud); ... section 1952 (racketeering); ... sections 2421–2424 (relating to white slave traffic)....

As will be shown, the only "predicate act" adequately alleged by plaintiff is "commercial bribery" under subsection (A).

**2.** *The Mann Act*

The defendant alleges that Willars, an NL employee, was a married man who was having an extramarital affair with Wissie Treesh. Gulf & Western allegedly hired Ms. Treesh in order to "use" her relationship with Willars to obtain purchase contracts from NL. In November of 1981, prior to the finalization of contracts for the purchase of air pressure vessels from Gulf & Western and Johnson Controls, Willars

was allegedly escorted to Las Vegas by defendant Bossart, Bossart's secretary, and Ms. Treesh. Plaintiff does not allege that Gulf & Western paid for this "illicit" venture.

18 U.S.C. § 2421 provides:

Whoever knowingly transports in interstate or foreign commerce ... any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose ... shall be fined not more than $5,000 or imprisoned not more than 5 years or both....

■ Plaintiff apparently claims that the trip to Las Vegas was designed to further the adulterous affair between Treesh and Willars, and was therefore for "any other immoral purpose." This claim must fail for two glaring reasons. First, the plaintiff does not claim that Gulf & Western sponsored the trip. If it did not, it could not have violated the Mann Act. Second, the on-going affair between two consenting adults in the 1980s was not "any other immoral purpose" as intended to be prohibited and punished by the Mann Act. "A primary purpose of the Mann Act was to protect women who were weak from men who were bad.... It was in response to shocking revelations of subjugation of women too weak to resist that Congress acted." *Wyatt v. United States*, 362 U.S. 525, 80 S.Ct. 901, 4 L.Ed.2d 931 (1960). Under the canon of *ejusdem generis*, the words "any other immoral purpose" are limited by the words "prostitution and debauchery." *Cleveland v. United States*, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946). Clearly, the actions herein do not rise (or fall, as the case may be), to this level. Therefore, the plaintiff has failed to allege a violation of the Mann Act.

### 3. *Mail/Wire Fraud*

Plaintiff also alleges mail and wire fraud violations by defendants as follows:

The activities of Gulf & Western, Willars, Bossart, and other named and unnamed co-conspirators in utilizing the U.S. mails and interstate telephone systems to facilitate their unlawful scheme to procure, secure, and allocate NL contracts are in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

■ Pursuant to F.R.Civ.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, a RICO claim predicated upon alleged mail or wire fraud must be set forth with enough particularity to satisfy Rule 9(b). *Van Dorn Co., Dent States Can Co. v. Howington*, 623 F.Supp. 1548 (D.C.Oh.1985); *Saine v. AIA, Inc.*, 582 F.Supp. 1299, 1303 (D.Colo.1984). When alleging wire and mail fraud as predicate acts of racketeering, a claimant must, pursuant to Rule 9(b), describe with particularity the circumstances constituting the fraud, including such matters as the time, place and content of the false representations, as well as identify the person making the misrepresentations and what was obtained or given thereby. *Van Dorn Co.*, 623 F.Supp. at 1555. The crime of mail fraud encompasses two well-defined elements: (a) the defendant must have first devised a scheme or artifice to defraud, and (b) then used the mails for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954).

■ The plaintiff in this case has failed to allege the "time, place and content" of the fraudulent use of the mails or wires. Accordingly, plaintiff has failed to satisfy the requirements of Rule 9(b). The plaintiff requests leave to amend. Although leave to amend is to be freely granted by the court under Rule 15(a), in this case even if plaintiff had alleged mail/wire fraud with sufficient particularity, plaintiff would still fail to state a RICO claim for reasons that will be set forth below.

### 4. *The Travel Act*

■ Plaintiff also contends that defendants used the airlines and U.S. mails to facilitate their unlawful scheme, in violation of 18 U.S.C. § 1952. Section 1952(a) makes it unlawful for "whoever travels in

interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to ... (3) ... promote, manage, establish, carry on, or facilitate the promotion management, establishment, or carrying on, of any unlawful activity [including bribery]." Although the court has found no cases on point, it would seem that the 9(b) rules of pleading would apply to this allegation since it must be established that the defendants had the specific intent to engage in or promote the fraudulent act (commercial bribery), and that the airlines or U.S. mails were used to further this purpose. The time and place of these "unlawful acts" must be pled with sufficient particularity to enable the defendant to respond to the claim, and not to force the defendant to undertake the burden of the defense merely on the basis of unsupported allegations of misconduct. *See, e.g., Ross v. A.H. Robins Co., Inc.,* 607 F.2d 545 (2d Cir.1979), *cert. denied* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

The plaintiff has not pled its allegation with sufficient particularity in this case. Therefore, the court need not consider the predicate act of an alleged violation of the Travel Act in determining whether the "pattern" requirement of § 1962 has been met.

### 5. *Pattern of Racketeering Activity*

As the complaint now stands, plaintiff has alleged only the predicate act of "commercial bribery." Clearly, this one act does not establish a "pattern" as that term is defined in § 1961(5) ("at least two acts of racketeering activity, one of which occurred after the effective date of this chapter, and the last of which occurred within 10 years after the commission of a prior act of racketeering activity.").

▬ Further, even if plaintiff had adequately alleged mail fraud, wire fraud, and Travel Act violations with sufficient particularity, the plaintiff would still have failed to establish a "pattern". In the now infamous footnote 14 of *Sedima SPRL v. Imrex Co.,* 473 U.S. 479, ——, 105 S.Ct.

3275, 3284, 87 L.Ed.2d 346, 358 (1985), the court stated: "Proof of two acts of racketeering activity, without more, does not establish a pattern.... The target of [RICO] is ... not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." Generally, to be related, the predicate acts of a § 1964 claim must involve common perpetrators, methods of commission, victims, or motives. *See Graham v. Slaughter,* 624 F.Supp. 222, 225 (N.D.Ill.1985). The alleged predicate acts herein are clearly "related." To be "continuous," more than sporadic or isolated activity must be alleged. In *Agristor Leasing v. Meuli,* 634 F.Supp. 1208 (D.Kan. 1986), this court held that in order to be "continuous," the "predicate acts must have taken place in the course of different criminal episodes of fraudulent schemes." Whether the racketeering activities are sufficiently continuous to constitute a pattern within the meaning of *Sedima* depends on such factors as the number of predicate acts, their duration, the nature of the scheme they are designed to promote, the actual or potential number of victims, the nature of the scheme's objectives, the number of participants in the scheme, the potential for continued criminal activity, and whether the particular scheme is part of a broader set of criminal objectives. In the case at bar, the alleged commercial bribery, and any fraudulent use of the mails or wires or airlines arose from a single episode—the attempt to obtain a contract from NL in November, 1981 to purchase air pressure vessels. This is not sufficiently continuous to constitute a "pattern" as this court has interpreted that term for purposes of a RICO violation.

### 6. *Sections 1962(a) and 1962(b)*

▬ Under § 1962(a), the plaintiff must establish that the defendant "invested" the income derived from a pattern of racketeering activity in the "establishment

**1128**

or operation of" the enterprise. Under § 1962(b), the plaintiff must establish that the person acquired an interest in the enterprise through a pattern of racketeering activity. The Supreme Court, in *Sedima*, emphasized that a "plaintiff only has standing if, and can recover only to the extent that, he has been injured in his business or property by the conduct constituting the violation." Thus, the plaintiff must be able to show, under (a), not only that the defendant invested illegally obtained proceeds in the enterprise, but that this investment caused the plaintiff's harm. Under (b), the plaintiff must show that it was harmed by the defendant's acquisition of the enterprise through a pattern of racketeering activity.

The plaintiff has not alleged facts sufficient for this court to find plaintiff has standing under (a) or (b). Even if plaintiff could show that defendants "invested" the illegal proceeds in the "enterprise" or that they "acquired an interest in the enterprise" due to their illegal acts, the plaintiff cannot show that such conduct caused the harm (fraudulent acquisition of the purchase contracts) for which plaintiff seeks relief.

If plaintiff suffered any RICO injury (which it did not), it was the result of the defendants conducting an enterprise through a pattern of racketeering activity—a violation of § 1962(c).

### 7. *"Person" Versus "Enterprise"*

■ This court has held twice previously, in *Smith v. Heim*, No. 85–1970 (D.Kan., unpublished Apr. 15, 1986), and *Agristor Leasing v. Meuli*, 634 F.Supp. 1208, that defendants and the enterprise must not be the same entity under § 1962(c). This is clearly the majority rule. If the "person" were not separate from the "enterprise", the person could not conduct the affairs of the enterprise.

■ In NL's complaint it is alleged that "Gulf & Western alone, and Gulf & Western in conjunction with other named and unnamed co-conspirators are an enterprise or enterprises...." (Complaint, ¶ 46.)

Plaintiff then alleges that "Gulf & Western, Willars, and Bossart are ... persons" who engaged in a pattern of racketeering activity. Plaintiff has failed to differentiate between the enterprise and the persons. Moreover, the facts in this case preclude such a differentiation. It is well settled that the "enterprise" must be an entity separate and apart from the pattern of racketeering in which the person engages. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). It is plaintiff's burden to allege the separate existence of an "association in fact" with a common purpose, continuity of structure and personnel, and an ascertainable structure distinct from the pattern of racketeering. *United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). In alleging that Gulf & Western alone, or Gulf & Western with Johnson Controls, Willars, and Bossart were an "enterprise", the plaintiff has failed to establish that the "enterprise" had a common purpose or that it existed apart from the racketeering activities. *See United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.), *cert. denied* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

Because the plaintiff has failed to allege that the defendants conducted the affairs of a separate and distinct enterprise through a pattern of racketeering activity, the § 1962(c) claim must be dismissed.

### 8. *Section 1962(d)—Conspiracy*

Plaintiff's theory, in alleging a violation of § 1962(d), appears to be that if the defendants violated (a), (b) or (c), they must have conspired to do so. However, this is simply not the law.

■ A RICO conspiracy allegation requires at least the pleading of the existence of one or more overt acts by the defendant in furtherance of the conspiracy and the assent of each defendant to the conspiracy. *Seville Industrial Machinery v. Southmost Machinery*, 742 F.2d 786 (3d Cir. 1984); *United States v. Sutherland*, 656

F.2d 1181 (5th Cir.1981), *cert. denied* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *Saine AIA*, 582 F.Supp. at 1307. Plaintiff's bare allegation that the defendants "conspired" to violate § 1962(a), (b) and (c) does not set forth a proper claim of conspiracy. Instead, the statement is a mere conclusion and does not permit the defendants to identify the conspiracy of which they are alleged to be a part.

Based on the foregoing, plaintiff's RICO claim should be dismissed without leave to amend. The complaint fails to state a cause of action under § 1962(a), (b), (c) or (d) for the reasons specified. Plaintiff has moved this court for an order entering final judgment on the RICO claim to allow immediate appeal of the RICO claim. This motion is denied.

### C. *Count Three—Fraud*

In Count Three of the complaint, NL alleges that defendants failed to disclose material information to NL relating to the fact that NL's sales manager, Mario Willars, was improperly induced to enter a series of purchase contracts with Gulf & Western. Plaintiff further claims that had it known Gulf & Western was bribing Willars, it would not have entered the contracts.

Defendants move for dismissal claiming that NL has failed to state a claim for fraud because NL has not and cannot allege (a) that Gulf & Western had a legal duty to disclose; (b) that Gulf & Western intended to defraud NL; or (c) that there was any difference between the price paid for the goods and the value of the goods had full "disclosure" been made. Alternatively, defendants contend the claim for fraud is defective as plaintiff failed to plead with sufficient particularity to satisfy F.R.Civ.P. 9(b).

The court notes that neither party has raised the issue of whether Texas law or Kansas law on fraud should apply. Both parties cite Kansas case law in support of their arguments. Accordingly, for purposes of this motion, the court will apply Kansas law.

In *Goben v. Barry*, 234 Kan. 721, 728, 676 P.2d 90 (1984), the Kansas Supreme Court, in an attempt to define fraud, stated:

> Fraud itself is difficult to define, but it has been held fraud "'in its general sense, is deemed to comprise anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust or confidence justly reposed, resulting in damage to another....'" (quoting *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 643 P.2d 100 (1982)).

■ Plaintiff's claim appears to fall within this broad definition. While there may be issues as to whether the defendants had a "legal or equitable" duty to disclose the alleged bribery or were in a position of "trust or confidence" by virtue of entering a sales contract with the plaintiff, and also as to whether the defendants had the requisite intent to deceive, these matters are not proper for disposition at the pleading stage. Defendants may also be later able to prove that plaintiff was not in any way harmed by entering these contracts. However, for purposes of pleading, it is sufficient that plaintiff has alleged that it would not have entered the contracts had it known all the facts. Therefore, when all factual allegations are taken as true and all inferences are drawn in plaintiff's favor, it appears that plaintiff may be able to state a cause of action for fraud.

Defendants argue that even if the acts complained of might state a cause of action for fraud, plaintiff's complaint is defective for failing to plead fraud with particularity as required by F.R.Civ.P. 9(b).

Rule 9(b) provides:

> In all averments of fraud or mistake the circumstances constituting the fraud or mistake shall be stated with particularity.

The requirement of greater specificity is intended to protect defendants from the harm that results from charges of serious wrongdoing, and to give the defendants

notice of the conduct complained of. Complaints alleging fraud should seek redress for a wrong, rather than attempt to discover unknown wrongs. *Bruss Co. v. Allnet Communication Services, Inc.,* 606 F.Supp. 401, 405 (N.D.Ill.1985).

■ However, Rule 9(b) must be read together with Rule 8, which requires a plain and concise statement of the claim. Wright & Miller, Federal Practice and Procedure, Civil § 1298. Therefore, although a plaintiff must allege with particularity the specific acts comprising the fraud, he need not plead detailed evidentiary matters.

■ Defendants argue that plaintiff has failed to allege with sufficient specificity the nature of the improper inducements, that is, what "items of value" Gulf & Western gave to Willars, and which, if any, trips to Las Vegas and Atlantic City were paid for by Gulf & Western. Defendants contend the complaint is insufficient because plaintiff must specify, with particularity, which defendant is responsible for which fraudulent act. In *Bruss v. Allnet,* 606 F.Supp. at 405, a case relied on by defendants, the court found that "when there are allegations of a fraudulent scheme with multiple defendants, the complaint must inform each defendant of the *specific fraudulent acts* which constitute the basis of the action against the defendant." (Emphasis added.) Similar rules were espoused in *Saine v. AIA, Inc.,* 582 F.Supp. at 1303, and *Dannenberg v. Dorison,* 603 F.Supp. 1238, 1244 (S.D.N.Y.1985). In this case the complaint fails to allege with specificity the nature of any improper inducements made by Gulf & Western to defendant Willars. Moreover, at the hearing on this motion, NL argued the defendants committed fraud by impliedly representing they were selling the items at the lowest price, and that they had not violated any laws in entering the purchase contracts. These facts are not alleged in the complaint.

Under Rule 15(a), leave to amend is to be freely granted. As previously noted, it appears from the bare bones of the complaint that plaintiff may be able to state a claim

for fraud. Therefore, the court will grant leave to amend. The plaintiff is to set forth the facts on which it bases its claim of fraud and misrepresentation with precision. Otherwise, the court will dismiss Count Six for failure to state a claim under Rule 9(b).

### D. *Counts Seven, Eight and Twelve— Claims Under Penal Statutes*

In Counts Seven, Eight and Twelve of the complaint, NL alleges the defendants are liable for commercial bribery as defined in K.S.A. 21–4405, deceptive commercial practices as defined in K.S.A. 21–4403, and civil conspiracy as defined in K.S.A. 21–3302. Defendants move for dismissal of each of these claims on the ground that plaintiff has no private right of action under these criminal statutes.

After taking the conspiracy claim under advisement at the July 2, 1986 hearing, the court will now grant defendants' motion as to each of these claims because (1) the legislature did not intend to create a private cause of action for violations of K.S.A. 21–4405 (commercial bribery), or K.S.A. 21–4403 (deceptive commercial practices); and (2) although Kansas recognizes the tort of civil conspiracy, plaintiff has failed to state a claim for conspiracy in this case.

■ The question of whether a criminal statute creates a private cause of action turns, to a great extent, on the intent of the legislature. *Davis v. Modine Mfg. Co.,* 526 F.Supp. 943 (D.Kan.1981). A court should inquire in the first instance whether the plaintiff is one of the class for whose especial benefit the statute was enacted. *Gray v. City of Kansas City, Kan.,* 603 F.Supp. 872, 874 (D.Kan.1985). In this case, both K.S.A. 21–4405 (bribery) and K.S.A. 21–4403 (deceptive practices) explicitly apply to *any person* who deceives in connection with a sale of merchandise, or who bribes or is bribed by another. Although the plaintiff argues that since these penal statutes fall under the heading "crimes affecting business," that "business" is the especial class sought to be

protected, these statutes clearly were enacted to protect the public at large.

Moreover, the judicial council comment to each of these sections indicates that the legislature intended to provide only a penal remedy for their violation. For instance, the comment to 21–4403 states: "This section is modeled upon the consumer fraud laws of Minnesota ... and Illinois.... However, neither the Minnesota nor the Illinois provisions are penal in nature. Both provide only injuncive remedies and are not found in the criminal codes." The implication is that the Kansas Legislature could have enacted a private remedy if it had wanted to, as did Minnesota and Illinois. However, it chose to enact an exclusively penal statute.

Likewise, the comment to 21–4405 states in part: "Bribery in matters involving public trust has long been regarded as *criminal*. During the past few years, the bribery concept has been expanded to include transactions not affecting government ... Model Penal Code 224.8 is the source for this section."

The federal criminal antitrust laws are perhaps analogous or more limited in scope than the criminal statutes upon which plaintiff relies. Yet, the antitrust laws have been held to create no implied cause of action. *See Texas Industries v. Radcliff Materials*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1980).

Plaintiff cites no legislative history and no cases by which this court could find an implied private right of action for commercial bribery or deceptive commercial practices. Therefore, these claims must be dismissed.

▆ Civil conspiracy, on the other hand, is recognized as a tort in Kansas. *See Citizens State Bank v. Gilmore*, 226 Kan. 662, 603 P.2d 605 (1979). To state a claim for civil conspiracy, the plaintiff must allege: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a proximate result. *Stoldt v.*

*City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984). Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy. *Stoldt*, 234 Kan. at 967.

▆ The plaintiff's claim contains the bare allegation that "defendants herein did willfully and purposely conspire to perpetrate specific acts of deceptive commercial practices and in commercial bribery in violation of the laws of the state of Kansas." This allegation is in fact a mere conclusion. The complaint fails to allege the requisite meeting of the minds between Gulf & Western and another defendant. Moreover, the complaint as a whole is utterly devoid of an "agreement" to commit deceptive trade practices or commercial bribery.

Finally, plaintiff cannot allege that either of the "overt acts" alleged (deceptive commercial practices, commercial bribery) is an actionable tort under Kansas law. Therefore, the alleged conspiracy is not actionable under Kansas law as expressed in *Stoldt. See also Ammon v. Kaplow*, 468 F.Supp. 1304, 1312 (D.Kan.1979) ("A conspiracy in and of itself is not actionable, but Kansas has long recognized there may be recovery against all members of the civil conspiracy by one who has suffered damages as a result of *actionable conduct* done by one or more of the conspirators pursuant to the conspiracy." (Emphasis added)). Accordingly, the claim for civil conspiracy must be dismissed.

### E. Count Nine—Texas Deceptive Trade Practices

In Count Nine, plaintiff alleges the defendants committed deceptive trade practices in violation of the Texas Consumer Protection and Deceptive Trade Practices Act, § 17.46. Defendants move to dismiss the claim for failure to state a claim, as plaintiff has failed to allege either the prerequisites of "notice" or that NL is a "consumer" within the meaning of the statute, and further, the statute is not applicable to the asserted "deceptive" acts of commercial bribery and price-fixing.

As an aside, the court first observes that by bringing this claim, plaintiff is evidencing its awareness that any harm to plaintiff occurred in Texas rather than Kansas. Plaintiff states in ¶ 64 of the complaint, "As a result of such conduct as above described, *much of which occurred in Texas . . . .*"

The Texas law is inapplicable in this case on the face of the complaint. The sections of the Texas Consumer Protection Act relied upon by plaintiff define deceptive business practices as:

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or mode, if they are of another.

\* \* \* \* \* \*

(23) the failure to disclose information concerning goods or services which was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

Plaintiff alleges defendants violated subsections (7) and (23) by failing to inform NL of the commercial bribery and price-fixing schemes. NL claims that if it had known about Gulf & Western's conduct, it would not have purchased supplies from Gulf & Western.

▮ The provisions allegedly violated clearly do not apply to this situation. They apply when express warranties are made as to the quality or condition of the goods sold—not the underlying transaction used to facilitate the purchase. None of the information Gulf & Western allegedly failed to disclose concerned the goods sold or the quality of those goods. Therefore, plaintiff has failed to allege defendants violated the Texas Consumer Protection Act, and this claim must be dismissed without leave to amend.

Having so found, the court need not reach defendants' argument that NL was not a "consumer" within the meaning of the Act (plaintiff would not have been a "consumer" as that term was defined in 1981, but would be one as that term is now

defined), nor determine whether NL's serving of a document subpoena on Gulf & Western in the *Johnson Controls* case was sufficient notice under the Act.

### F. *Count Ten—Breach of Implied Covenant of Good Faith*

In Count Ten of the complaint it is asserted that Gulf & Western breached the implied covenant of good faith and fair dealing in the contracts it entered with NL by bribing an NL employee. Defendants move for dismissal arguing the plaintiff has failed to state a claim under Kansas law which refuses to recognize a tort of bad faith.

In arguing that Kansas does not recognize the tort of "bad faith," defendants rely on *State Farm Fire & Casualty Co. v. Liggett,* 236 Kan. 120, 689 P.2d 1187, 1195 (1984), and *Spencer v. Aetna Life & Casualty Ins. Co.,* 227 Kan. 914, 611 P.2d 149, 158 (1980). Each of these cases addressed the issue of whether the plaintiff could assert the tort of bad faith against a defendant-insuror who failed to pay under an insurance policy. In both instances, the Kansas Supreme Court held "legislative provisions authorizing certain penalties against an insuror *for lack of good faith* are sufficient remedies for an aggrieved insured. [Therefore] the tort of bad faith is not recognized in Kansas." *Spencer,* 227 Kan. at 914, Syl. ¶ 2.

The defendants' reliance on these cases is misplaced. First, plaintiff has not asserted the tort of bad faith which implies malice and wantonness in refusal to perform under a contract, but rather, has asserted a breach of the implied covenant of good faith in entering the contract. Second, all of the cases relied on by the Kansas court in *Liggett* and *Spencer* are cases interpreting *insurance* contracts. An insurance contract is a very different type of contract from any other, and the law which applies to it may not apply to all contracts. Therefore, the *Liggett* and *Spencer* cases have little precedential value here.

■ Although plaintiff does not raise this argument, the court notes that U.C.C. § 1–203 imposes an obligation of good faith in the performance of "every contract within this act." *See also Meier's Trucking Co. v. United Constr. Co.,* 237 Kan. 692, 699, 704 P.2d 2 (1985) (Holmes, J., dissenting). Clearly, the contract herein is a contract for the sale of goods under Article 2. *See* K.S.A. 84–2–106(1). On this basis, the court declines to dismiss this claim at the pleading stage.

### G. Count Thirteen—Misappropriation of Trade Secrets

In Count Thirteen of the complaint, plaintiff asserts that defendants have misappropriated trade secrets from NL through Mario Willars in a willful and malicious manner, in violation of K.S.A. 60–3320 *et seq.* Defendants contend plaintiff has failed to state a claim under this statute.

"Misappropriation" is defined in K.S.A. 60–3320(2) as:

(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

"Improper means" as used in subsection (2)(i) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy. K.S.A. 60–3320(1).

In ¶ 19 of the complaint, plaintiff alleges:
... Mr. Willars made it known to both Gulf & Western and Johnson Controls that NL in Houston would be ordering 24–inch motion compensation bottles, and provided both companies with trade-secret documents, drawings and design data which had been prepared for NL by a vendor....

■ NL does not allege that Willars was bribed into delivering these trade secrets, nor that Gulf & Western acquired them by theft or misrepresentation. Rather, NL simply alleges that Willars handed the trade secrets over voluntarily. Moreover, NL fails to allege that Gulf & Western ever made use of these trade secrets or that Gulf & Western even knew the drawings and design data were trade secrets in order to constitute a violation of 60–3320(2)(ii).

Accordingly, this count fails to state a claim. However, the court will sustain plaintiff's motion to amend.

### II. Gulf & Western's Motion to Dismiss Pursuant to Statute of Limitations

In defendants' motion to dismiss, they have asserted that each of the plaintiff's claims are time-barred, with the exception of the claim for fraud. According to the plaintiff's complaint, all of the allegedly illegal activities took place in July through November of 1981. This action was not filed until November 18, 1985, more than four years later.

The court has found that plaintiff failed to state claims for RICO (Count Six), commercial bribery under the Robinson-Patman Act (Count Two), commercial bribery under Kansas law (Count Seven), deceptive commercial practices under either Kansas or Texas law (Counts Eight and Nine), and civil conspiracy (Count Twelve). The court

need not address whether any of these claims are also time-barred. Therefore, the court will address the statute of limitations issue only in regard to the remaining claims: tortious interference with fiduciary relations (Count One), restraint of trade under state law (Count Four), restraint of trade under the Sherman Act (Count Five), breach of the implied covenant of good faith (Count Ten), and misappropriation of trade secrets (Count Thirteen).

The claims for breach of an implied covenant of good faith and tortious interference with fiduciary relations are governed by K.S.A. 60–513(a)(4), which provides a 2–year statute of limitations. However, under 60–513(b), the cause of action is not deemed to have accrued until the plaintiff discovers the injury or could reasonably have discovered the injury.

Likewise, a claim for misappropriation of trade secrets must be brought within three years after the misappropriation is discovered, or by the exercise of reasonable diligence could have been discovered. K.S.A. 60–3325.

The claim for restraint of trade under state law is "an action upon a liability created by statute other than a penalty or forfeiture" to which the 3–year limitation of K.S.A. 60–512(2) applies.

■ Finally, a claim based on restraint of trade under the Sherman Act must be brought "within four years after the cause of action accrues." 15 U.S.C. § 15(b). The cause of action is deemed to have accrued when the defendant commits an act which injures plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

As previously stated, all of Gulf & Western's allegedly illegal activities occurred in July through November of 1981. Suit was not filed until November 18, 1985, more than four years later. Therefore, each of the plaintiff's claims is untimely on its face. However, in NL's reply brief, and in argument, NL contends that due to the secretive nature of the defendants' activities, the true facts were concealed from plaintiff until October of 1984, when it began discovery in the *Johnson Controls* case. Thus, according to plaintiff, the accrual of the tort claims and the misappropriation claim were suspended, and the limitation periods for the remaining claims were tolled. These allegations of fraudulent concealment of the illegal conduct were not set forth in the complaint. Only as to the fraud count did plaintiff allege "the facts set forth in this count were unknown to plaintiff until or about October of 1984."

■ Under Kansas law, fraudulent concealment does not toll the statute of limitations unless the plaintiff's claim for relief is grounded in fraud. *McCoy v. Wesley Hospital & Nurse Training School*, 188 Kan. 325, 331, 362 P.2d 841 (1961). In this case, the plaintiff has asserted a claim for fraud. However, such an allegation, standing alone, is insufficient to invoke the doctrine of equitable tolling. NL must allege a concealment of facts that would prevent it from knowing a cause of action existed. *See Gideon v. Gates*, 5 Kan. App.2d 23, 25, 611 P.2d 166 (1980). Moreover, NL must allege that its ignorance was not the result of its lack of diligence, but was due to affirmative acts by defendants that would conceal the facts giving rise to the claim from a reasonably diligent plaintiff. *Pike v. City of Mission, Kansas*, 731 F.2d 655, 658 (10th Cir.1984). Absent a fiduciary duty between the parties, it is insufficient to show mere silence or passive conduct on the part of the defendants. *Kansas City, Missouri v. Federal Pacific Electric Co.*, 310 F.2d 271, 278 (8th Cir.), *cert. denied* 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962). The facts establishing fraudulent concealment must be pled with particularity. *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir.1981). *See also Preston v. Shields*, 159 Kan. 575, 156 P.2d 543 (1945). Conclusory allegations that plaintiff lacked knowledge of the claims until a certain date are insufficient. *King & King Enterprises*, 657 F.2d at 1154.

■ The complaint in this case contains no facts from which the court could find

that fraudulent concealment has been pled with particularity. The plaintiff has asked the court's leave to amend to allege equitable tolling. F.R.Civ.P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Due to the fraudulent nature of the alleged activities of the defendants, this court finds it just to allow the plaintiff to amend its complaint in an attempt to allege fraudulent concealment. In so doing, plaintiff is cautioned to set forth facts *with particularity* as to what affirmative acts defendants took to conceal their activities and why NL could not have discovered the allegedly illegal conduct through due diligence. If plaintiff's own employees (other than Willars) had knowledge of the alleged bribery, NL will be charged with this knowledge, and thus unable to show it used due diligence. If NL fails to plead sufficient facts to establish fraudulent concealment, each of the claims must be dismissed as time-barred.

NL is estopped from alleging, as it attempts in its brief, that the limitations period did not begin to run until "mid–1982" because of a "continuing conspiracy." As previously found, NL has failed to state a claim for conspiracy to commit commercial bribery or to violate RICO. Moreover, any Sherman Act injuries sustained by the alleged price-fixing were final at their inception, even though the impact of the acts may have continued to be felt. *Pike v. City of Mission, Kansas,* 731 F.2d at 660.

Accordingly, the motion to dismiss Counts 1, 4, 5, 10 and 13 will be denied, and plaintiff is granted leave to amend the complaint with regard to these counts to allege equitable tolling.

To summarize, the court has sustained Gulf & Western's motion to dismiss for failure to state a claim as to Counts 2, 6, 7, 8, 9 and 12. Plaintiff is given leave to amend Counts 3 and 13 in order to attempt to state a claim. Finally, plaintiff is given leave to amend Counts 1, 4, 5, 10 and 13 to allege equitable tolling of the statute of limitations. The plaintiff is given until September 5, 1986, in which to file its

amended complaint. Finally, defendants' motion for Rule 11 sanctions is denied.

### III. *Willars' and Bossart's Motions to Dismiss*

Pursuant to F.R.Civ.P. 12(b)(2), defendants Willars and Bossart move the court to dismiss this action on the ground of lack of *in personam* jurisdiction. The defendants alternatively move for dismissal for improper venue under Rule 12(b)(3), and Bossart alleges insufficient service of process pursuant to Rule 12(b)(4). In support of their motions, both defendants contend that any contacts they may have had with the State of Kansas were so minimal that for this court to assert jurisdiction would offend traditional notions of fair play and justice.

Both Bossart and Willars resided in Houston, Texas, at all relevant times hereto. Willars, as NL's plant manager in Houston, allegedly made two trips to Kansas to secure purchase contracts with Gulf & Western's Taylor Forge Plant. He had no other contact with Kansas. Defendant Bossart, during the initial phases of the transactions herein, was employed as Taylor Forge's sales representative in Houston, Texas. He later left Taylor Forge to work as a sales representative for Johnson Controls, also in Houston. NL, in its brief opposing the motion to dismiss, asserts Bossart had the following "contacts" with Kansas:

1. To retroactively comply with NL Shaffer's policy that no purchases [sic] orders could be placed without an inspection of the vendor, Bossart (then working for Taylor Forge) escorted NL's junior buyer, Bob Pavlock, and one of NL's quality insurance inspectors, Lynn Lehman, to Kansas in July, 1981. The trip was made *after* Mario Willars ordered the purchasing department personnel to buy accumulators from Taylor Forge.

2. Bossart's expense accounts while employed by Taylor Forge were sent to

his supervisor, Rod Sutton, in Kansas and paid for from Paola, Kansas.

3. Bossart caused purchase orders to be placed with Taylor Forge in Kansas by NL Shaffer and, at various dates in 1981, NL Shaffer paid for these goods in Kansas.

4. The commissions and bonus earned by Bossart while employed by Taylor Forge were paid out of Kansas. Portions of these monies relate to "tainted" sales to NL and to the conduct of Bossart, *as an individual,* as pled in the complaint.

According to these allegations, Bossart made one business-related trip to Kansas and was paid out of Kansas.

Before addressing the motions to dismiss, the court notes that default had been entered against Bossart prior to his filing this motion for dismissal out of time. Plaintiff then moved this court for default judgment against Bossart and to strike his motion to dismiss. The court denied NL's motions at the hearing on July 2, 1986. Bossart's motion to set aside default was granted by the court pursuant to Rule 60(c) upon a finding of good cause shown.

As this action is founded upon diversity of citizenship, the court must look to Kansas law for the basis of *in personam* jurisdiction over nonresident defendants. *Doyn Aircraft, Inc. v. Wylie,* 443 F.2d 579 (10th Cir.1971); *Hoster v. Monongahela Steel Corp.,* 492 F.Supp. 1249 (W.D.Okla.1980).

■ Personal jurisdiction in a diversity case requires a 2–step analysis. First, it must be determined that there is a relevant Kansas long-arm statute which authorizes service of process on the defendant. Second, the defendant must have sufficient contacts within Kansas to satisfy due process. *Thermal Insulation Systems v. Ark-Seal Corp.,* 508 F.Supp. 434 (D.Kan. 1980).

The Kansas long-arm statute, K.S.A. 60–308(b), provides in part:

Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:

(1) Transaction of any business within the state;

(2) commission of a tortious act within this state;

\* \* \* \* \* \*

(5) entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state; ...

The Kansas Supreme Court has repeatedly held the legislative intent behind K.S.A. 60–308(b) is to exert judicial jurisdiction over nonresidents to the full extent permitted by the due process clause of the Fourteenth Amendment. *Whisenant v. Whisenant,* 219 Kan. 387, 392, 548 P.2d 470 (1976). If the statute is to reach as far as due process permits, a broad statutory interpretation is necessary. *J.E.M. Corp. v. McClellan,* 462 F.Supp. 1246, 1250 (D.Kan.1978). The exercise of personal jurisdiction is proper under this statute where defendant's conduct is such that it " 'purposefully avails itself' " of the privilege of acting within the forum state and invoking its laws. The act or acts must have " 'reasonably foreseeable consequences within the [forum] state.' " *Pedi Bares, Inc. v. P & C Food Markets, Inc.,* 567 F.2d 933, 937 (10th Cir.1977).

■ For purposes of Rule 12(b)(2), the burden of proof rests upon the party asserting the existence of personal jurisdiction. *Wilshire Oil Co. of Texas v. Riffe,* 409 F.2d 1277 (10th Cir.1969). This burden, however, is met by a prima facie showing that jurisdiction is conferred by the long-arm statutes. *Thermal Insulation,* 508 F.Supp. at 437.

Plaintiff did not plead that it complied with the Kansas long-arm statute, nor does it argue the application of the long-arm

statutes in its briefs opposing defendants' motion to dismiss. Instead, NL argues that personal jurisdiction exists over both defendants in Kansas under a "conspiracy theory." NL relies on *Professional Investors Life Ins. Co. v. Roussel,* 528 F.Supp. 391 (10th Cir.1981), and *Wegerer v. First Commodity Corp. of Boston,* 744 F.2d 719 (D.Kan.1984). These cases provide that jurisdiction may be obtained over a nonresident co-conspirator who has no direct contacts with the forum state, provided the other co-conspirator is subject to the forum court's jurisdiction. However, in order for the conspiracy theory of jurisdiction to apply, the plaintiff must allege "a conspiracy to commit a business tort which had *foreseeable consequences in Kansas.*" *Roussel,* 528 F.Supp. at 404. Moreover, the allegations of a conspiracy must not be too conclusory or too unsupported to be given credence.

In this case, the plaintiff cannot allege that any harmful "consequences" occurred to it in Kansas. The injury, if any, did not occur in Kansas, but in Texas. Further, this court has previously found that plaintiff failed to state a claim for civil conspiracy. Accordingly, the conspiracy theory of jurisdiction is inapplicable in this case.

Plaintiff also asserts the RICO Act, 18 U.S.C. § 1965(d), as providing an independent basis for *in personam* jurisdiction over the individual defendants. The RICO claim has been dismissed in its entirety. Therefore, NL cannot rely on RICO to establish personal jurisdiction.

Even if the court had not dismissed the RICO claim, it is not clearly established that § 1965(d) affords nationwide jurisdiction. For instance, in *Van Schaick v. Church of Scientology of Cal., Inc.,* 535 F.Supp. 1125, 1132–33 (D.Mass.1982), the court held that notwithstanding § 1965(d)'s authorization of nationwide service of process, the traditional due process analysis of examining the nature and quality of defendants' contacts with the forum state must be applied. *Contra, Soltex Polymer Corp. v. Fortex Industries, Inc.,* 590 F.Supp. 1453, 1459 (E.D.N.Y.1984).

■ The second step in analyzing the question of the existence of personal jurisdiction concerns due process. Under the due process analysis, the court must look to the "quality and nature" of a defendant's activity to determine whether it is both "reasonable" and "fair" to require the defendant to conduct his defense in the forum state. *Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). It is essential that there was some act by which the defendant purposely availed himself of the privilege of conducting activities within the forum state, thus involving the benefit and protection of its laws. *Hansen v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

Willars argues that he did nothing in Kansas except to represent his company (NL) in contract negotiations, making only one or two trips to the Taylor Forge Plant in Paola, Kansas. As such, he argues his contacts were insufficient, and that the hardship in defending the action in Kansas (inability to compel witnesses, etc.) tips the balance in favor of denying jurisdiction on due process grounds. Likewise, Bossart argues he made only business-related trips to Kansas while employed by Taylor Forge, and thus did not purposefully avail himself of this court's jurisdiction. Entering a state as an agent for a corporation does not establish "minimum contacts." *See Wilshire Oil Co.,* 409 F.2d at 1277.

NL, on the other hand, argues the defendants' trips to Kansas were in furtherance of their conspiracy to bribe Willars into entering the purchase contracts. Plaintiff argues this is sufficient to satisfy the "minimum contacts" requirement.

■ After examining the facts before it, the court must conclude that any contacts either of these defendants had with this state were of such a limited nature as to make it both unreasonable and unfair to require them to conduct their defenses in this state. NL has failed to state a claim for conspiracy. But even if there had been a "conspiracy" to bribe Willars, any harm to the plaintiff caused by entering pur-

**1138**

chase contracts with Gulf & Western's Kansas plant (Taylor Forge) were felt by the plaintiff in Houston, Texas, where its plant was located. These defendants simply did nothing in this state by which they purposely availed themselves of this state's laws. As such, both defendant Willars' and defendant Bossart's motions to dismiss pursuant to Rule 12(b)(2) are granted.

Having so ruled, the court need not address the motions to dismiss pursuant to Rules 12(b)(3) and 12(b)(4).

IT IS ACCORDINGLY ORDERED this 6 day of August, 1986, that the motion to dismiss pursuant to Rule 12(b)(6) of defendants Gulf & Western is denied in part and granted in part. The motions to dismiss pursuant to Rule 12(b)(2) of defendants Mario Willars and William Bossart are granted. Plaintiff has until September 5, 1986, to file its amended complaint. The case is scheduled for a status conference on September 15, 1986, at 1:00 P.M. Out of town counsel may stand by for a conference call.