**RAYMARK INDUSTRIES, INC., a Connecticut Corporation,**
**Plaintiff,**

v.

**Gordon A. STEMPLE, et al.,**
**Defendants.**

**No. 88–1014–K.**

United States District Court,
D. Kansas.

Aug. 10, 1988.

**462**

Jeffrey D. Lewin, Sullivan, McWilliams, Lewin & Markham, San Diego, Cal., for plaintiff.

William S. Boggs, David E. Monahan, Jeff L. Mangum, Robert A. McGregor, Gray, Cary, Ames & Frye, San Diego, Cal., for Gordon A. Stemple and Richard F. Gerry.

Jack Corinblit, Marc M. Seltzer, Corinblit & Seltzer, Los Angeles, Cal., for Gordon A. Stemple.

Turner and Boisseau, Wichita, Kan., and William H. Ginsburg, Harry Rebhuhn, Wood, Lucksinger & Epstein, Los Angeles, Cal., for Clara V. Gelbard.

Ara Aghishian, Aghishian & Danielian, Hollywood, Cal., for B. Rama Rao and Krishan Bharadwaja.

Gans & Blackmar, San Diego, Cal., for Krishan Bharadwaja.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This matter is before the court on separate motions to dismiss brought by defendants Gordon A. Stemple and Richard F. Gerry pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), and by defendant Clara V. Gelbard pursuant to Rule 12(b)(6). In this action, plaintiff Raymark Industries, Inc. ("Raymark") alleges that the named defendants defrauded Raymark in connection with its class action settlement which was administered by this court. Defendants Stemple and Gerry are attorneys who filed claims against Raymark on behalf of tire workers who had allegedly been injured due to their exposure to asbestos manufactured by Raymark. These claimants were diagnosed by the defendant doctors, Clara V. Gelbard, B. Rama Rao, and/or Krishan Bharadwaja ("the medical defendants"). In this action, Raymark asserts the manner in which the claims were manufactured was fraudulent and that the claims themselves were false and/or frivolous. In its complaint, Raymark asserts claims against these five defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, common law fraud, and "unfair business practice" as defined by CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200. Additionally, Raymark asserts a claim for negligence against the medical defendants, and a claim for rescission of the settlement with the tire workers against all named defendants, including all local counsel and the class of all tire worker claimants.

In the motions now pending, defendants Gerry and Stemple assert that all claims against them must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Rule 9(b) for failure to allege fraud with sufficient particularity. They further move, pursuant to Rule 12(f), to strike those portions of the complaint detailing how the tire workers' claims were manufactured, as they contend such facts are irrelevant to plaintiff's claims. In a separate motion, defendant Gelbard asserts she is entitled to have all claims against her dismissed pursuant to Rule 12(b)(6) as she is absolutely immune from liability under the doctrine of witness immunity.

The court may not dismiss plaintiff's complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78

S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, all factual allegations, as distinguished from conclusory allegations, must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff. *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir.1984). In reviewing the sufficiency of Raymark's complaint, the court must determine not whether Raymark will ultimately prevail, but whether it is entitled to offer evidence which supports its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Motions to dismiss are generally viewed with disfavor. *NL Industries, Inc. v. Gulf & Western Industries, Inc.*, 650 F.Supp. 1115, 1122 (D.Kan.1986).

For the reasons set forth herein, the court finds that the motions to dismiss must be denied as Raymark has adequately stated its claims.

## I. *Facts and Procedural History*

Before setting forth the facts as pleaded by Raymark in its complaint, a brief explanation of the procedural background is warranted.

Attorneys Stemple and Gerry, defendants herein, enjoy national prominence for their activities and success in the personal injury field. In recent times, the attorneys' focus has been in the pursuit of damages for those allegedly injured as a consequence of exposure to asbestos products. Today, any manufacturer or processor of asbestos is a likely target for a personal injury claim, as the product is now known to be a causative agent for serious lung impairment. Raymark is such a target. The massive filings of such claims abound and are pending in multiple numbers in most courts across the country. This consequence has contributed much to the state of congestion as pertains to the orderly exercise of court management. Indeed, it has presented a serious challenge for all the courts, and cries out for a reasonable and efficient solution. It was in this spirit that this court agreed to entertain a class action settlement.

The class action settlement, captioned *Wells v. Raymark Industries, Inc.*, No. 87–1016–K, provides for the disposition and processing of approximately 20,000 claims by those who claim exposure to defendant Raymark's asbestos products and have demonstrated some lung impairment which was probably caused or contributed to, in part, by exposure to Raymark's product. The full mechanics of this procedure are well known to all parties and are not relevant here. It is from the *Wells* settlement, however, that the instant case arises.

In the course of the *Wells* settlement, approximately 7,000 claims from certain "tire workers" were presented through plaintiff's lead counsel by attorneys Stemple and Gerry, defendants herein. These claims emanate from approximately 12 states and have been coordinated with the assistance of defendants' local counsel. Approximately $16 million was set aside for this purpose of settling these claims.

Early in *Wells*, Raymark complained as to the propriety of the tire worker claims. Consequently, the processing of these claims was suspended and a random audit by Raymark representatives was authorized. Thereafter, Raymark advised the court that the settlement process could be resumed. The court thus assumed that the problems had been resolved. At that time, approximately 5,000 claims were processed and were either paid out or were under way for review and payment.

Throughout this process, unbeknownst to the court, Raymark had continued with its review of the tire worker claim process, and for reasons expressed in several pleadings filed in *Wells*, was convinced that many of the claims were not only false and invalid, but were fraudulently processed. Rather than further alert the court or to complain here, Raymark filed at least 12 suits against defendants Stemple and Gerry, Dr. Gelbard, Dr. Rao, Bharadwaja, each local attorney and representative claimants, in each of the several states from which the claims originated. Raymark included a count under 18 U.S.C. § 1964 (RICO) and a fraud count in each complaint.

Once these actions were under way, Raymark moved here for a stay of the dis-

bursement of funds to the tire workers until the state actions were resolved. Defendants Stemple and Gerry then filed a motion on behalf of Dimas D. Alonzo, a claimant, for injunctive relief preventing Raymark from prosecuting the state actions.

In due course the motions were heard, and both were granted. The court ordered further proceedings in the state actions stayed. It further ordered that the settlement funds for approximately 1200 pending claims be rolled over to a separate interest-bearing account until the dispute is resolved. Finally, the court advised that should Raymark wish to proceed with its claims against the tire workers' attorneys, it should do so in this court. The court opined that the claim process could thus be clarified and Raymark's claims simplified and tested by way of summary judgment motion.

Thereafter, Raymark filed the action now pending. As noted, Raymark's complaint joins not only defendants Stemple and Gerry, but the same defendant doctors, each of the local counsel, and representative claimants from within the several states. The complaint similarly includes counts in RICO, fraud, and several pendent state claims.

During a status conference with counsel for Raymark and defendants Stemple and Gerry, the discovery process was shaped to the extent that the litigants were encouraged to proceed solely with that which was necessary as pertains to Raymark's claims against attorneys Stemple and Gerry. It was assumed that the massive filings in the state actions would, in part, suffice their respective needs, but, of course, the litigants were at liberty to discover representatives of Raymark, defendants Stemple and Gerry, the physicians, the local attorneys, and representative claimants, if counsel deemed such a process to be necessary. Additionally, the court stayed the requisite of the filing of an answer by all of the remaining defendants until such time as the matters against attorneys Stemple and Gerry could be resolved. The scheduling process anticipated hearing on defendant attorneys' inevitable summary judgment motion by the fall of 1988. The court did not anticipate that the claims would be tested by way of a motion to dismiss. Now, notwithstanding, defendants Stemple and Gerry have filed their motion to dismiss the complaint in its entirety.

According to the allegations in the complaint which is now before the court, when Raymark reviewed the tire workers' files during the court-authorized audit, it was satisfied that the medical reports by defendants Gelbard, Rao and Bharadwaja, which it assumed were legitimate and in accord with professional standards, supported the terms of the settlement agreement. Raymark claims now that it has since learned facts which establish that the medical diagnoses were fraudulent, negligent, or mistaken.

Specifically, Raymark alleges that sometime in 1986 defendants Stemple and Gerry and the medical defendants founded an organization called the "National Tire Workers Litigation Project" ("NTWLP"), ostensibly to promote employee safety and awareness. The group funded the purchase of vans equipped with x-ray equipment, known as "examobiles". The NTWLP contacted union representatives in order to arrange massive employee examinations in tire manufacturing plants throughout the country. It was understood that if any adverse findings were noted, the tire worker would become a client of attorneys Stemple and Gerry and would file a claim for his or her asbestos-related injuries. Raymark further asserts that local attorneys were utilized to submit the claims.

According to the complaint, the medical defendants possessed, at best, the most limited of credentials—Bharadwaja was not licensed in the United States, Rao was a radiologist and not qualified to diagnose asbestos disease, and Gelbard had been previously sued for misrepresenting her qualifications and for submitting incompetent medical reports. These medical defendants were paid $50.00 for each two-page diagnosis they prepared. Their diagnoses were based solely on information supplied

by the x-rays obtained in the examobile in an assembly line fashion (100–150 tire workers were "examined" each day); the medical defendants performed no personal examinations.

Raymark alleges that the NTWLP's rate of diagnosis of asbestos disease among these tire workers was 3 to 4½ times greater than among shipyard workers who are known to have the greatest risk. Raymark also claims that the defendants knew that the tire workers' disease, if any, was not caused by Raymark's products, which contained long asbestos fibers, and that, in fact, many of these tire workers had no disease at all.

Finally, Raymark contends that if it had known the true facts, it would never have paid any of the tire workers' claims.

The court must now determine whether the facts as alleged support the claims asserted by Raymark. Because there are pendent state law claims asserted, the court first must determine which state's law controls.

## II. *Choice of Law*

A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Robert A. Wachsler, Inc. v. Florafax Int'l, Inc.*, 778 F.2d 547, 549 (10th Cir.1985). Therefore, the court must look to Kansas law to determine which state's laws should be applied.

Kansas follows the *lex loci delicti* approach of the First Restatement, which means the law of the "place of the wrong" controls. *Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731 (1985) (rejecting the "most significant relationship" analysis of RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1969)); RESTATEMENT OF CONFLICTS § 378 (1934). Thus, the law of the state where the tort occurred applies. Although this determination is somewhat uncertain when tortious conduct in one state causes injury in another, the Kansas Supreme Court ruled that the "place of the wrong" is that place where the last event necessary to impose liability took place. *Ling*, 237 Kan. at 634–35, 703 P.2d 731; *see also* RESTATEMENT OF CONFLICTS § 377. In a personal injury tort case, such as *Ling*, the "last event" is the injury. Thus, the law of the place of injury applies. 237 Kan. at 634–35, 703 P.2d 731.

The Kansas court has not addressed the issue of where the place of the wrong is in a fraudulent misrepresentation case involving parties of diverse citizenship who have facilitated the fraud through interstate commerce. Pursuant to the First Restatement, however, "[w]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made." FIRST RESTATEMENT OF CONFLICTS § 377 note 4. Likewise, Judge Saffels has recently held that, pursuant to Kansas' choice of law rules, the law of the place where the "effects" of a negligent misrepresentation are felt should control. *Seitter v. Schoenfeld*, 678 F.Supp. 831, 836 (D.Kan.1988).

In the case at bar, all moving defendants argue that Kansas law controls because Kansas was the situs of the settlement agreement and also the situs of the disbursement of funds. Raymark, on the other hand, contends that either Connecticut (the place of Raymark's incorporation) or California law should apply, but that this is necessarily a factual inquiry which must await trial.

Raymark's position on this issue is not well founded. First, choice of law issues are clearly matters of law for resolution by the court. Second, the court is convinced that "the place of the wrong" was Kansas: the settlement took place in Kansas, and as such defendants' representations were received in Kansas; the settlement monies were kept in Kansas and were paid to the claimants from Kansas. Thus, the loss to Raymark was sustained in Kansas. Moreover, if Raymark's allegations are accepted as true, there has been a fraud upon this court, as well as upon Raymark. Therefore, the court firmly believes that Kansas law should control the fraud and negligence issues.

■ Defendants argue that the rescission claim concerns a contractual rather than tortious dispute and requires a different choice of law inquiry. Raymark argues that the claim is not a matter of contract because plaintiff is not attempting to rescind the entire settlement agreement—just a portion thereof. In this court's view, the claim is a matter of contract. A separate "settlement" is reached each time a claimant is paid. Each of these "contracts" is entered into in Kansas. In contract actions, Kansas applies the rule of *lex loci contractus*—the law of the state in which the contract is made. *First National Bank v. Hough,* 643 F.2d 705, 706 (10th Cir.1981). Thus, Kansas law applies to the rescission claim as well.

### III. *The Fraud Claim*

Although the first count contained in Raymark's complaint is a claim for violation of RICO, the court will initially address whether the plaintiff has stated a claim for fraud and negligent misrepresentation. If the plaintiff cannot state a claim for fraud, the RICO claim will necessarily fail without need for further analysis. Defendants Gerry and Stemple assert that the fraud claim should be dismissed pursuant to Rule 9(b) for lack of particularity in the complaint, or pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In conjunction with their motion to dismiss, these defendants further move that portions of the complaint which detail the "mechanics" of how the tire workers' claims were originated and the medical defendants' qualifications (or lack thereof) be stricken pursuant to Rule 12(f), as they are immaterial to the fraud claim.

■ First turning to the motion to strike, defendants seek to have the following allegations stricken for reasons which the court has here summarized: (1) Complaint ¶ 50g.1. Stemple and Gerry founded the NTWLP. This fact is irrelevant to the settlement agreement, cannot form the basis of the fraud action, and was known to Raymark at the time of the settlement; (2) ¶ 50g.2. Stemple and Gerry financed the examobiles. This fact is immaterial and irrelevant to the fraud claim; (3) ¶ 50g.3. The examobiles tested 100–150 tire workers daily. This fact is immaterial and irrelevant to the fraud claim; (4) ¶ 50g.4. Gelbard was paid $50.00 per diagnosis without independent investigation. This fact is immaterial and irrelevant to the fraud claim; (5) ¶ 50g.5. Bharadwaja is not licensed to practice medicine in the United States. The settlement agreement did not require that the opinion be rendered by a licensed physician, so this fact is irrelevant to the fraud claim; (6) ¶ 50g.6. Rao was a radiologist and was unqualified to diagnose asbestos injury. This fact is irrelevant and immaterial, no representation regarding Dr. Rao was made; moreover, he was qualified to render an opinion; (7) ¶ 50g.7. Gelbard had been previously sued for fraud in preparing medical reports. This fact is irrelevant and immaterial; there was no duty to disclose; (8) ¶ 50g.8. NTWLP's rate of diagnosis of asbestos disease was 3 to 4½ times the rate as that among shipyard workers. This fact is immaterial to the fraud claim and Raymark had prior knowledge; (9) ¶ 50g.9. The type of asbestos fibers found in the tire workers' lungs were not Raymark's fibers. This fact is immaterial; the settlement agreement did not require that Raymark asbestos caused the asbestos injury; (10) ¶ 50g.10. Many of the tire worker claimants have been subsequently diagnosed as having no asbestos disease. This fact is immaterial to the fraud claim because the whole purpose of the settlement was to resolve *disputed* claims; the subsequent diagnosis simply demonstrates that there was dispute.

In arguing that each of these allegations is immaterial and irrelevant to a claim for fraudulent misrepresentation, defendants are contending that the *only* representations they made to Raymark were those contained in the settlement agreement itself, i.e., that the claimants "have been exposed to an asbestos-containing product manufactured by Raymark and have suffered an asbestos-related injury." (Notice of Class Action & Proposed Settlement, No. 87–1016–K, p. 4.) Defendants contend that this criteria was satisfied, and thus they argue that the way in which the claims

were derived is absolutely irrelevant and that they had no duty to disclose any of these facts.

Defendants further argue that Raymark's allegation in ¶ 50f of its complaint that the defendants falsely represented: "(1) Tire worker claimants had been diagnosed as having diseases caused by exposure to Raymark's asbestos-containing products; (2) the diagnoses were valid medical diagnoses; [and] (3) the doctors performing the diagnoses were licensed medical doctors and competent to perform said diagnoses," cannot support a fraud claim as these representations were *not* part of the settlement agreement.

The defendants' argument is an attempt to distract the court from seeing the forest by showing it the trees. By discussing each factual allegation individually and concluding no "representation" was made as to that fact, the defendants attempt to divert the court's attention from the true claims. As the court understands the plaintiff's fraud claim, it is that defendants, by filing claims against Raymark and participating in the class action settlement, made certain representations as to the *existence* of an asbestos-related injury. However, in "manufacturing" the claims as they did, the defendants were either submitting claims they knew to be false and frivolous, or submitting such claims with reckless disregard as to their truth. Thus, the factual allegations regarding how the claims were manufactured demonstrate the "intent" or "reckless disregard" on the part of the defendants, a necessary element of fraud in Kansas. *See Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 467, 738 P.2d 1210 (1987) ("The misrepresentation must be known to be untrue by the person making the statements, or made with reckless disregard for the truth, and reliance thereon must be reasonable and justifiable."). Accordingly, the "manufacturing of claims" allegations are material to the fraud claim and defendants' motion to strike will be denied.[1] This includes the allegations as to the medical defendants' qualifications. (The court is convinced that based on the allegations, these witnesses could not pass Rule 702 muster.) Again, submitting claims based on "diagnoses" made by doctors with questionable credentials is evidence of an intent to deceive.

In Kansas, the elements of fraudulent misrepresentation require the making of a representation that is false, pertaining to a past or present fact which is material; the fact must be susceptible of knowledge; the representer must know it to be false or must assert it as of his own knowledge without knowing whether it is true or false; the representer must intend to have the other person induced to act; that person must be so induced to act or justified in acting; the action must be in reliance upon the representation; and the person must

---

1. During oral argument on this motion, the court voiced its grave concerns as to the professional propriety of the alleged conduct of the defendant attorneys in this matter. While this is a matter which is not before the court and would properly be addressed by a state ethics committee, the court would make the following observation in that the alleged conduct of defendants Gerry and Stemple challenges the propriety of the entire class settlement process. For however successful and well intended the defendants' action may appear to be as it pertains to affording those injured by asbestos their day in court, these lawyers are not the guardians of the public's welfare and have no license to put in place a vehicle whereby the lawyer pursues the claim.

According to the allegations, attorneys Stemple and Gerry are the principal instigators of the whole tire worker process: they have encouraged litigation, mobilization of prospective claimants, and the unmistakable solicitation of each; they have designed, financed and engaged the format which includes diagnosis solely by analysis of x-rays by doctors with questionable credentials, and have filed claims based on such diagnoses, having never met their clients. In this court's view, this is the shabbiest form of claims practice. The professional code of conduct is clear. *See* Canon 2 of *Code of Professional Responsibility*. Certainly, claims solicited, encouraged, and financed by lawyers *should be discouraged and challenged*.

In any event, the court is convinced that the entire course of conduct, as alleged in plaintiff's complaint, is relevant here. If such lawyers will so willingly defy their professional code of conduct, they will hardly be found to take care as to the propriety of their product. Thus, such acts put in place the basis for a fraud claim. This fraud, as alleged, was not only upon Raymark, but upon this court! A full factual inquiry is clearly necessitated.

suffer damage which is attributable to the misrepresentation. *See Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545 (1980).

■ The allegations set forth by Raymark in the complaint satisfy the elements of fraudulent misrepresentation under Kansas law. Raymark has alleged that the defendants falsely represented that the tire workers' had viable claims; that they did so with knowledge of the untruth or with reckless disregard for the truth; that they intended Raymark to settle these claims; that Raymark did settle the same believing the diagnoses to be valid; and that, therefore, Raymark paid $16,000,000.00 which it would not have paid had it known the truth. These allegations are set forth with precision, so the court finds the requisites of Fed.R.Civ.P. 9(b) have been satisfied without further need to discuss defendants' motion to dismiss for failure to comply with Rule 9(b). Of course, each of these allegations will clearly be the subject of controversy. But such will be of a factual nature—not appropriate for resolution at the pleading stage. Accordingly, defendants' motion to dismiss the fraud claim must be denied.

Plaintiff also asserts a claim for negligent misrepresentation. As this claim is simply a "lesser included" form of fraudulent misrepresentation, the plaintiff's complaint also satisfies the elements of such a claim.

### IV. *The Rico Claim*

In Count I of the complaint, Raymark claims that the conduct of both the attorneys and the medical defendants was in violation of RICO, 18 U.S.C. § 1962(a), (c) & (d).

RICO was originally enacted by Congress in order to eradicate organized crime in the United States by strengthening the legal tools available and providing enhanced sanctions and new remedies for fighting organized crime. *United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). As part of the sweeping legislation, Congress created a private cause of action pursuant to which a prevailing plaintiff who has been "injured in his business or property by reason of a violation of section 1962" will be awarded treble damages and attorney fees. 18 U.S.C. § 1964(c). It was Congress' intent that RICO be read broadly. *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Furthermore, it was the intent of Congress that RICO apply to "legitimate" enterprises which had been infiltrated with crime, as well as to the "traditional" racketeering enterprises. 473 U.S. at 489, 105 S.Ct. at 3281.

Nearly 15 years after the passage of the RICO legislation, the Supreme Court observed in *Sedima* that private civil actions under RICO are brought almost solely against "legitimate" businesses which have engaged in garden variety fraud, and that "RICO is evolving into something quite different from the original conception of its enactors." 473 U.S. at 500, 105 S.Ct. at 3287. The Supreme Court opined that this is the result of the broad, sweeping language of the statute, as well as the failure of the courts to develop a workable concept of the "pattern" requirement. *Id.*

Since the *Sedima* opinion, lower courts— including this court—have attempted to heed the words of the high court in analyzing the "pattern" requirement and thereby limit the application of RICO to the types of conduct Congress intended to punish. The pattern requirement will be discussed *infra*. The court must first begin its analysis of plaintiff's RICO claim by setting forth the requisite elements which must be pleaded.

Section 1962 sets forth the "prohibited activities." Raymark alleges that defendants' conduct was in violation of subsections (a), (c) and (d), which provide in pertinent part as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activi-

ties of which affect, interstate or foreign commerce....

....

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

Both subsections (a) and (c) share certain requirements:

(1) a person; (2) an enterprise; and (3) a pattern of racketeering activity. Under subsection (a), the unlawful conduct is using or investing proceeds derived from the pattern of racketeering activity in acquiring or operating the enterprise. Under subsection (c), it is unlawful for a person employed by or associated with the enterprise to conduct the affairs of the enterprise through a pattern of racketeering activity.

"Person" is defined in § 1961(3) as "any individual or entity capable of holding a legal or beneficial interest in property." "Enterprise" is defined in § 1961(4) as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

"Racketeering activity" is defined in § 1961(1) as any act chargeable under several generically described state criminal laws; any act indictable under numerous specific federal criminal provisions, including mail and wire fraud; and any offense involving bankruptcy or securities fraud or drug-related activities punishable by federal law.

Finally, "pattern of racketeering activity" is defined in § 1961(5) as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter, and the last of which occurred within ten years after the commission of a prior act of racketeering activity."

While this definition requires at least *two* acts, "proof of two acts of racketeering activity, without more, does not establish a pattern." *Sedima*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14. "The target of [RICO] is ... not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 91–617, p. 158 (1969) (emphasis in original)). This court has previously put in place a definition of "pattern" which will be discussed herein. *See Wichita Federal Savings & Loan Assoc. v. Landmark Group, Inc.*, 674 F.Supp. 321, 330–31 (D.Kan.1987).

■ Once the plaintiff has established that a § 1962 RICO violation has occurred, in order to be entitled to relief the plaintiff must demonstrate injury to his business or property by reason of the violation. 18 U.S.C. § 1964(c). However, the plaintiff need not plead or establish a racketeering injury which is distinct from the damages occurring as a result of the racketeering activities of the defendants. *Sedima*, 473 U.S. at 495, 105 S.Ct. at 3284.

In the case at bar, the plaintiff has alleged that defendants Gerry and Stemple, along with the medical defendants (the "persons") devised a scheme to defraud asbestos manufacturers, such as Raymark, by creating the NTWLP (the "enterprise") and conducting their activities as previously set forth. Plaintiff alleges that the defendants repeatedly utilized the mails and wires in furtherance of their scheme, thereby committing mail and wire fraud. Plaintiff alleges that the scheme was open-ended and ongoing. Plaintiff further alleges that the defendants used the income received from their unlawful activity to operate the NTWLP, and conducted the NTWLP's affairs through a pattern of racketeering activity, and conspired to do the same. Raymark asserts that by reason of the violations of 18 U.S.C. § 1962(a), (c) and (d), it was injured in its business as a

result of paying $16,000,000.00 to settle fraudulent claims.

In their motion to dismiss, defendants Stemple and Gerry contend the complaint fails to state a claim under RICO because: (1) it fails to allege the underlying fraud and racketeering acts with sufficient particularity; (2) it fails to allege the requisite "pattern" of racketeering activity; (3) it fails to distinguish between the "persons" and the "enterprise" which is required by § 1962(c); (4) it fails to allege that Raymark's injuries were caused by the use or investment of proceeds derived from a pattern of racketeering as required by § 1962(a); and (5) it fails to state a claim for conspiracy to violate RICO pursuant to § 1962(d) as no overt acts are alleged. Finally, defendants argue that Raymark, as a private party, is not entitled to injunctive relief under RICO.[2]

### A. Racketeering Activity

■ In its complaint, Raymark alleges that defendants committed acts of mail fraud as follows:

a. In violation of Title 18, United States Code, Section 1341, knowingly and willfully:

(1) placed in post offices and authorized depositories for mail for delivery by the United States Postal Service various items such as, but not limited to, letters, medical reports and claim forms. In particular, upon information and belief, the mails were used to execute the scheme in that the California attorney defendants, sometimes by and through the local attorney defendants or others, submitted phony claims to Raymark and this Court utilizing the United States mails.

(Complaint, ¶ 51).

Plaintiff further alleges defendants committed acts of wire fraud (18 U.S.C. § 1343) by transmitting "various writings, signs, signals and sounds including ... items such as settlement demands and acceptances of settlement offers." *Id.* Plaintiff

also alleges that defendants violated 18 U.S.C. § 2314 by transporting in interstate commerce "money of a value of more than $5,000 knowing the same to have been obtained by fraud." *Id.*

Pursuant to Fed.R.Civ.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This court has previously held that Rule 9(b) applies to averments of mail and wire fraud. *NL Industries, Inc. v. Gulf & Western Industries*, 650 F.Supp. 1115, 1129 (D.Kan.1986). Rule 9(b) must be read together with Rule 8, which requires a plain and concise statement of the claim. Thus, "although a plaintiff must allege with particularity the specific acts comprising the fraud, he need not plead detailed evidentiary matters." *Id.* at 1130.

Raymark's complaint is sufficiently particular. The crimes of mail and wire fraud encompass two well-defined elements: (1) the defendant must first have devised a scheme or artiface to defraud, and (2) then used the mails or wires for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). As previously stated, Raymark has complied with Rule 9(b) in alleging fraud. These defendants, Raymark, and this court are abundantly familiar with claims, medical forms, and settlement demands which were mailed or telexed between the parties via this court. Thus, the complaint, as written, sufficiently informs the defendants as to the nature of the allegations they are asked to defend, and further particularization as to "time, place or content" is unnecessary.

Accordingly, the defendants' motion to dismiss pursuant to Rule 9(b) is denied.

### B. Pattern of Racketeering Activity

■ It next must be determined whether Raymark has alleged that defendants engaged in a pattern of racketeering activity.

---

**2.** Along with its prayer for treble damages and attorney fees, Raymark has prayed for "a preliminary and permanent injunction restraining defendants from continuing the operations of

NTWLP and screening and filing claims on behalf of tire workers against Raymark." (Complaint, ¶ 2, pp. 26–27.)

This court has had several occasions to address the pattern requirement. In *NL Industries*, 650 F.Supp. at 1127, this court discussed and defined "pattern" as follows:

In ... footnote 14 of *Sedima, SPRL v. Imrex Co.*, 473 U.S. [479], 105 S.Ct. 3275, 87 L.Ed.2d 346, 358 (1985), the court stated: "Proof of two acts of racketeering activity, without more, does not establish a pattern.... The target of [RICO] is ... not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." ... The alleged predicate acts herein are clearly "related". To be "continuous," more than sporadic or isolated activity must be alleged. In *AgriStor Leasing v. Meuli*, 634 F.Supp. 1208 (D.Kan.1986), this court held that in order to be "continuous," the "predicate acts must have taken place *in the course of different criminal episodes of fraudulent schemes.*" Whether the predicate acts are sufficiently continuous within the meaning of *Sedima* depends on such factors as the number of predicate acts, their duration, the nature of the scheme they are designed to promote, the actual or potential number of victims, the nature of the scheme's objectives, the number of participants in this scheme, the potential for continued criminal activity, and whether the particular scheme is part of a broader set of criminal objectives. In the case at bar, the alleged commercial bribery, and any fraudulent use of the mails or wires or airlines arose from a single episode—the attempt to obtain a contract from NL in November 1981 to purchase air pressure vessels. This is not sufficiently continuous to constitute a "pattern" as this court has interpreted that term for purposes of a RICO violation.

Subsequent to the *NL* decision, the Tenth Circuit has similarly held that a pattern requires continuous and related acts. *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 928 (10th Cir.1987). The court held that acts which are part of a common fraudulent scheme are related. *Id.* In the case at bar, the acts were clearly related as they were part of a scheme to induce Raymark, or other asbestos manufacturers, into defending or settling frivolous claims.

The *Torwest* court further held that in order to satisfy the "continuity" requirement there must be a threat of ongoing activity. 810 F.2d at 928. In *Torwest*, the court held that a single fraudulent scheme which has a definite purpose, the completion of which will end the scheme, does not have sufficient "continuity". *See also Pitts v. Turner & Boisseau*, 850 F.2d 650 (10th Cir.1988); *Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212, 213–14 (10th Cir.1987); *Condict v. Condict*, 826 F.2d 923, 928–29 (10th Cir.1987). However, the Tenth Circuit refused to formulate a bright-line test as to the continuity requirement, endorsing instead a case-by-case approach. Thus, while the court did not determine whether a single scheme directed toward a single victim which is open-ended and does not have a single goal will satisfy the continuity requirement, it did make the following observation:

A more difficult question is presented when the RICO claim is based on one scheme involving one victim, but the plan contemplates open-ended fraudulent activity and does not have a single goal that, when achieved, will bring the activity to an end. Some courts have found that such an ongoing scheme is itself sufficient to satisfy the continuity element of a RICO pattern. See, e.g., *Morgan v. Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir.1986); see also *Illinois Dept. of Revenue v. Phillips*, 771 F.2d 312 (7th Cir.1985). Other courts may require additional *proof* showing that the defendants have engaged in similar activity in the past, or have been involved in other criminal activity, or pose a threat of similar activity in the future. See, e.g., *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986).

810 F.2d 929.

Based on this language in *Torwest*, this court has previously held that alleging a single scheme which is open-ended satisfies

the "continuity" element of the pattern requirement. *See Wichita Federal Savings & Loan Assoc. v. Landmark Group, Inc.,* 674 F.Supp. 321, 331. Likewise, in this district, Judge O'Connor, following the rationale of *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986), which was cited with approval by the Tenth Circuit in *Torwest,* has held that a single scheme which is open-ended satisfies this requirement. *See Smith v. MCI Telecommunications Corp.,* 678 F.Supp. 823, 826 (D.Kan.1987); *Bumgarner v. Blue Cross & Blue Shield of Kansas, Inc.,* No. 86–4069 (D.Kan. Jan. 28, 1988). *See also O'Connor v. Midwest Pipe Fabricators, Inc.,* 660 F.Supp. 696, 697 (D.Kan.1987) (Judge Saffels). *But see Boyer v. Cline,* No. 85–1562 (D.Kan. July 22, 1987), 1987 WL 54381 (Judge Crow held single scheme, even though open-ended, does not establish a pattern).

In this case, Raymark's factual allegations satisfy the continuity requirement as defined above. Raymark has specifically alleged that the defendants' scheme to defraud was open-ended and ongoing. While the complaint does not specifically state that the NTWLP is continuing to file claims against Raymark, such an allegation may be inferred from Raymark's prayer for injunctive relief. This inference is bolstered by Raymark's arguments in its briefs and at oral argument to the effect that the NTWLP has and is continuing its scheme by filing fraudulent claims against Raymark as well as other asbestos manufacturers. Raymark further asserted that the NTWLP came into existence and began manufacturing claims prior to the beginning of the class action settlement. The court is itself aware of the many claimants who opted out of the class and whom these defendants continue to represent in their lawsuits against Raymark.

Based on the allegations contained in the complaint and Raymark's representations to the court, there is sufficient allegation of a pattern. Dismissal for failure to allege a pattern is therefore unwarranted.

## C. Enterprise/Person Distinction

■ The majority of courts, including this court, hold that under § 1962(c), which provides that it is "unlawful for any person ... associated with any enterprise ... to conduct ... such enterprise's affairs through a pattern of racketeering activity," the person and the enterprise must be separate and distinct.[3] *See Wichita Federal Savings & Loan Assoc. v. Landmark Group, Inc.,* 674 F.Supp. at 330; *AgriStor Leasing v. Meuli,* 634 F.Supp. 1208, 1223 (D.Kan.1986). *See also Schofield v. First Commodity Corp.,* 793 F.2d 28 (1st Cir. 1986); *Bennett v. U.S. Trust Co.,* 770 F.2d 308 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Hirsch v. Enright Refining Co.,* 751 F.2d 628 (3d Cir.1984); *Rae v. Union Bank,* 725 F.2d 478 (9th Cir.1984); *Bennett v. Berg,* 685 F.2d 1053 (8th Cir.1982). *But see United States v. Hartley,* 678 F.2d 961 (11th Cir.1982). The reasoning is that under the language of the statute, if the "person" were not distinct from the "enterprise", the person could not "conduct the affairs of" or "associate with" the enterprise as required by subsection (c). In other words, the enterprise cannot "conduct" its own affairs or "associate with" itself. Moreover, on a policy level, without this requirement a deep pocket corporation which fits the definition of both an "enterprise" and a "person" could be held liable under subsection (c) even though it is merely the passive instrument for the wrongdoing of others. (For a thorough analysis of the person/enterprise distinction see *Haro-*

---

**3.** Although the defendants have not raised the issue here, the language of subsection (a) differs from that of subsection (c) and does not appear to require that the person and enterprise be distinct. Although courts have split on this issue, *see Smith v. MCI Telecommunications Corp.,* 678 F.Supp. at 827, and cases cited therein, this court is convinced that the better approach is not to require a distinction. "This approach to subsection (a) thus makes the cor-

poration-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern racketeering activity.... This result is in accord with the primary purpose of RICO, which, after all, is to reach those who ultimately profit from racketeering." *Haroco v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384, 402 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

co v. *American National Bank & Trust Co. of Chicago,* 747 F.2d at 400–402.)

■ In the case at bar, defendants Stemple and Gerry are clearly "persons" (as are the medical defendants). The NTWLP, if not a legal entity, is clearly an association-in-fact and so is an "enterprise" as defined by subsection 1961(4).

Defendants argue that the NTWLP does not satisfy the RICO definition of enterprise because it is not a structure separate and distinct from the alleged racketeering activity. In *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981), the Supreme Court addressed the requirement of pleading an enterprise as a separate element from the "pattern" of racketeering activity:

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 USC § 1961(1) (1976 ed. Supp III) [18 USCS § 1961(1)]. *The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.* The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

(Emphasis added). The Court's statements in *Turkette* were made as a basis for reversing the circuit court's holding that a wholly criminal organization could not be a RICO "enterprise". The Court of Appeals had reasoned, in part, that if a criminal organization could be a RICO enterprise, pleading the underlying "pattern of racketeering" would suffice as to the "enterprise" requirement as well, but, the court reasoned, this could not have been the statute's purpose. 452 U.S. at 582, 101 S.Ct. at 2528. The Supreme Court rejected this reasoning and held that the two requirements—although related—are separate, and that a wholly criminal enterprise *can* be a RICO enterprise, noting, "Language in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." 452 U.S. at 583 n. 5, 101 S.Ct. at 2529 n. 5. Thus, when read in context, it is clear the *Turkette* court intended that the RICO "enterprise" element could be satisfied by pleading the existence of an "ongoing organization", even if the sole purpose of such enterprise was to conduct criminal activities.

In the case at bar, the plaintiff has properly pleaded both an enterprise and acts of racketeering activity. The NTWLP, according to the allegations, is a group of people who have associated together for the purpose of gathering claims against asbestos manufacturers. This purpose is of a continuous nature. In the course of its conduct, various acts of racketeering (e.g., mail and wire fraud) have allegedly been committed by the enterprise. Clearly, however, these "acts" and the "enterprise" are not pleaded as one and the same. Thus, the defendants' argument that the NTWLP has no separate and distinct structure must be rejected.

■ Defendants next argue that plaintiff has failed to allege a distinct enterprise from the persons. The gist of defendants' argument is that the NTWLP and the named defendants are one and the same; thus, there is no distinction. Raymark counters that the NTWLP is made up not just by the five named RICO defendants, but by numerous local counsel and medical technicians who acted as conduits for the wrongdoing.

The court would first note that it has serious doubts as to any possible liability on the part of the local counsel against whom no intentional wrongdoing has been alleged. *See Medical, Inc. v. Angicor Ltd.*, 677 F.Supp. 1000, 1006 (D.Minn.1988) (court eliminated innocent "co-conspirators" from the "enterprise"). Thus, the court will analyze this issue under the assumption that the enterprise is comprised solely of the five named defendants.

While it is true, as defendants argue, that these five defendants are the same five who are "associated" as the NTWLP, the court is persuaded that a distinction exists. As previously noted, the policy behind requiring a distinction between the person and the enterprise is to prevent a corporation from being held liable under subsection (c), when it is, in fact, the passive instrument of others. This court's research reveals that the issue of the enterprise/person distinction most frequently arises when plaintiffs claim the corporation is an association-in-fact with either its officers or employees or subsidiary corporations, and that the corporation is also the "person" conducting its own affairs. In this way, the deep pockets of the corporation can be reached. *See, e.g., Entre Computer Centers v. FMG of Kansas City, Inc.*, 819 F.2d 1279, 1287 (4th Cir.1987); *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 444 (5th Cir.), *cert. denied*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987); *Schofield v. First Commodity Corp.*, 793 F.2d 28; *Hirsch v. Enright Refining Co.*, 751 F.2d 628; *Haroco*, 747 F.2d 384; *United States v. Computer Sciences Corp.*, 689 F.2d 1181 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *NL Industries, Inc. v. Gulf & Western Industries, Inc.*, 650 F.Supp. at 1128; *Bumgarner v. Blue Cross*, slip op. at 15–16. However, the present case is distinguishable in that the enterprise is an association of persons, and liability is sought as to each person rather than as to the enterprise itself. This very situation was addressed by the *Haroco* court as follows:

Where persons associate "in fact" for criminal purposes, each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity. But the nebulous association in fact does not itself fall within the RICO definition of "person." We doubt that an "association in fact" can, as such, hold any interest in property or even be brought into court. In the association in fact situation, each participant in the enterprise may be a "person" liable under RICO, but the association itself cannot be.

747 F.2d 384, 401.

In the case at bar, the individual defendants constitute "persons" under RICO, while their association—the NTWLP—comprises a RICO enterprise separate and distinct from the individual defendants. Accordingly, the court holds that the complaint adequately distinguishes between the "person" and "enterprise" elements of the RICO claim for purposes of § 1962(c).

### D. Causation

 Defendants next assert that any injury to Raymark resulted only from the predicate acts, i.e., the underlying fraud. Thus, they argue, Raymark cannot satisfy the requirement under subsection 1962(a) that its injury is the result of the defendants' investment of racketeering proceeds in the enterprise. Plaintiff counters by arguing that "it [was] the proceeds from the continuing pattern of racketeering activity antedating the *Wells v. Raymark* class action which financed the NTWLP and which enabled Stemple ... to injure Raymark." (Raymark's Surreply, p. 4.)

The court finds that it is unnecessary to determine whether Raymark has adequately alleged that its injuries arose out of the investment of proceeds in the NTWLP because it is persuaded that the compensable injury for purposes of a violation of subsection (a) is the harm caused by the predicate acts. In reaching this conclusion, the court departs from a statement it made in *NL Industries* that "the plaintiff must be able to show, under (a), not only that the defendant invested illegally obtained proceeds in the enterprise *but that this investment*

*caused the plaintiff's harm.*" 650 F.Supp. 1115, 1128 (emphasis added).[4]

The court has now had occasion to review this issue and finds that language in *Sedima* requires it to hold that injury by predicate acts *is* compensable. Although the *Sedima* court was addressing a subsection (c) violation, its statements are enlightening:

> If the defendant engages in a pattern of racketeering activity in a manner forbidden by [§ 1962(a)(5) or (c) ], and the *racketeering activities injure the plaintiff* in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

473 U.S. at 495, 105 S.Ct. at 3284 (emphasis added). Addressing subsection (c), the Court concluded, "The compensable injury is the harm caused by the predicate acts...." *Id.* at 497, 105 S.Ct. at 3285.

Relying on the above language in *Sedima,* Chief Judge O'Connor recently ruled that injury resulting from the predicate acts suffices for recovery under subsection (a). *Smith v. MCI Telecommunications Corp.,* 678 F.Supp. 823, 828–29. The court stated in part:

> [T]he language of section 1962 and 1964(c) does not dictate that the plaintiff's injury be caused by the use of the racketeering proceeds. Section 1964(c) allows a person injured by a section 1962 violation to recover damages. When a corporation affecting interstate commerce commits racketeering acts and uses the proceeds in its operations, it has violated section 1962(a). A plaintiff injured by the predicate acts is injured as a result of the violation in spite of the fact that one element of the violation, the use of the proceeds, did not contribute to or cause his injury. *See Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809 (7th Cir.1987) (a plaintiff may recover under section 1964(c) by proving a violation of section 1962 and "an injury directly re-

sulting from some or all of the activities comprising the violation;" the plaintiff need not prove that every act involved in a RICO pattern caused him a direct injury); *Haroco v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 396–98 (7th Cir. 1984) (a plaintiff may recover under section 1964(c) by proving a violation of section 1962 and an injury resulting from the underlying racketeering acts; in a section 1962[a] action, the plaintiff need not prove that he was injured by the defendant's participation in the enterprise), *aff'd,* 473 U.S. 606 [105 S.Ct. 3291, 87 L.Ed.2d 437] (1985).

678 F.Supp. at 829. *See also Wilcox v. First Interstate Bank of Oregon,* 815 F.2d 522, 529 (9th Cir.1987); *B.F. Hirsch, Inc. v. Enright Refining Co.,* 617 F.Supp. 49 (D.N.J.1985). This court agrees with the reasoning in *Smith* and will therefore hold that alleging harm due to the predicate acts is sufficient to satisfy the causation requirement when claiming a violation under subsection (a). Thus, dismissal of the § 1962(a) claim is not required.

### E. Conspiracy

The defendants argue that if the claims under subsections (a) and (c) are dismissed, the claim under subsection (d) (conspiracy to violate RICO) must also be dismissed as the plaintiff has alleged no overt acts in furtherance of the conspiracy. Having found that plaintiff's complaint states a claim for violations of subsections (a) and (b), it is clear that "overt acts" have adequately been pleaded, and so the motion to dismiss subsection (d) will be denied.

### F. Injunctive Relief

Finally, the defendants argue that plaintiff's complaint must be dismissed insofar as it seeks injunctive relief under RICO. Defendants rely on *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1088–89 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987), to support this argument.

---

**4.** Prior to addressing the causation issue in *NL,* the court had ruled that plaintiff's RICO claim had to be dismissed because plaintiff could not allege a "pattern". Thus, the causation issue was not dispositive.

In *Wollersheim,* after an exhaustive analysis of RICO's legislative history, the Ninth Circuit concluded that no injunctive relief is available under RICO. This court finds the decision persuasive. However, plaintiff asserts it seeks injunctive relief pursuant to its common law claims as well as RICO. Moreover, the request for such an injunction is not presently before the court. As such, dismissal of the prayer for injunctive relief would be premature. The court will address the issue of the propriety of an injunction if and when it is brought by motion before the court.

Having addressed each of defendants' arguments for dismissal of the RICO claim, the court finds the same to be without merit and thus will deny the motion to dismiss RICO.

### V. *Unfair Business Practice*

Defendants next argue that plaintiff's claim in Count IV of its complaint for "unlawful, unfair and fraudulent business practice as defined by California Business and Professions Code section 17200" must be dismissed because Kansas law—not California law—controls this action. Having previously ruled that Kansas law does apply, the court agrees that this claim must be dismissed.

Plaintiff argues that even if Kansas law applies, Count IV should not be dismissed unless there is "no statutory or common law equivalent to section 17200" in Kansas. (Plaintiff's Response, p. 86.) However, plaintiff has cited no authority to suggest or support such an equivalent cause of action. Having failed to do so, this court will grant defendants' motion to dismiss Count IV.

### VI. *Rescission*

Finally, defendants Stemple and Gerry argue that plaintiff's claim in Count V of its complaint for rescission of the settlement with the tire workers must be dismissed because rescission would be impracticable, the plaintiff's other claims for relief must be dismissed, and the court has no power to modify the class action settlement agreement. Defendants assert "no claim for rescission could possibly be based on anything other than fraud. Thus, rescission for 'mistake' could never be justified because no mistake by Raymark concerning the strengths or weaknesses of the tire worker claims could justify rescission." (Defendants' Memorandum, p. 70.)

This court has previously ruled that the plaintiff has stated a claim for fraud and for RICO. Thus, plaintiff's claim for rescission is indeed based upon fraud. Further, if the court were to rescind a portion of the settled claims, it would not be "modifying" the settlement agreement itself, but would be finding the tire workers' claims are fraudulent and thus failed to comply with the agreement. Therefore, defendants' argument in this regard is misplaced. Finally, whether or not such a remedy is "practicable" is not before the court at the pleading stage. Whether such a remedy can or should be invoked will depend upon facts which have yet to be developed. Thus, dismissal of this claim, based on the arguments presented by defendants, would be premature.

For all of the foregoing reasons, defendants Stemple and Gerry's motion to dismiss will be denied as to Counts I, II and V, and will be granted as to Count IV.

The court must next address defendant Gelbard's motion to dismiss.

### VII. *Defendant Gelbard's Motion to Dismiss/Witness Immunity*

Defendant Gelbard argues that all claims against her (Count I, RICO; Count II, fraud; Count III, medical malpractice/negligence; Count IV, unfair business; and Count V, rescission) must be dismissed for failure to state a claim pursuant to Rule 12(b)(6) as she is absolutely immune from liability under the doctrine of witness immunity.

The doctrine of witness immunity derives from common law and is based on the notion that "the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Briscoe v. LaHue,* 460 U.S. 325, 333, 103 S.Ct. 1108, 1114, 75 L.Ed.2d 96 (1983). The trial setting, including an impartial judge, a jury, the adversarial relationship of the parties, the rules of evidence as applied by

the judge, the right to cross-examine witnesses, and the right to present contrary evidence, provides an adversarial mechanism that is designed to winnow out the truth from a body of evidence. The truth-finding process is inhibited if witnesses are in fear of being sued for statements made in court. Moreover, criminal charges may be filed against a witness for perjuring his testimony.

In *Briscoe v. LaHue,* the Supreme Court held that police officers are absolutely immune from liability under 42 U.S.C. § 1983 for testifying falsely at trial. Although the statements were made in the courtroom, the Court stated that they would receive absolute immunity for all statements that are "relevant to the judicial proceeding." 460 U.S. at 331–32, 103 S.Ct. at 1113.

In this case, the doctrine of witness immunity does not apply because, according to the allegations contained in the complaint, defendant Gelbard was a co-conspirator in the scheme to defraud Raymark.

As previously determined, Raymark's complaint states a claim for fraudulent misrepresentation. According to the allegations, defendant Gelbard was an actual participant in this scheme to manufacture claims against asbestos manufacturers, including Raymark. Defendant Gelbard was allegedly paid $50.00 per examination of an x-ray—she did not meet her "patients". Thus, Gelbard is being sued—not for her testimony as an expert witness—but for her false and fraudulent *acts* in diagnosing the tire workers.

In *Hokanson v. Lichtor,* 5 Kan.App.2d 802, 626 P.2d 214 (1981), the Kansas Court of Appeals addressed the issue of whether a cause of action lies against an expert witness for perjury or conspiracy to commit perjury. In *Hokanson,* the action was brought following the trial in which the expert had allegedly perjured his testimony. The court dismissed the claims. In doing so, it followed the majority rule that no civil action exists for perjury, reasoning that "the remedy for perjury is criminal punishment or an action to set aside the judgment rather than a civil action for damages." 5 Kan.App.2d at 805, 626 P.2d 214. *Accord Briscoe v. LaHue,* 460 U.S. at 333, 103 S.Ct. at 1114. The court further found that no claim was stated for civil conspiracy because the plaintiff could not allege an overt act, i.e., the commission of a wrong 150 diagnoses a day for five days) by "diagnosing" tire workers. This is hardly the work of an ordinary witness. Therefore, under the facts as alleged in Raymark's complaint, Gelbard is not entitled to immunity from liability as to any of the claims asserted against her. Having so decided, the court need not address Raymark's additional arguments against the application of the witness immunity doctrine (i.e., the statements were unsworn and out of court; and, the witness immunity rule applies only to defamation actions). If, after discovery, the fraud allegations are unsupported by facts, the court will necessarily re-examine whether Gelbard is entitled to immunity.

 Gelbard also argues that the claim in Count III of negligence/medical malpractice must be dismissed because she, as an adversary's expert witness, owed no duty to Raymark. In light of the allegations, however, Gelbard was not a mere "expert witness." As a co-conspirator in a scheme to defraud, she certainly owed a duty to those she sought to defraud. As such, the court will deny her motion to dismiss this claim.

Finally, Gelbard argues that the rescission and unfair business practice claims must be dismissed. The court has previously addressed each of these claims in regard to Stemple and Gerry's motion. The same findings apply to Gelbard and need not be reiterated.

As such, defendant Gelbard's motion to dismiss is denied.

Given these findings, the case will proceed, and the discovery process is anticipated to commence in a timely way.

The court has previously expressed its doubts as to the merit of claims against the local attorneys and representative claimants who appear to be mere conduits of the scheme. Counsel for Raymark is request-

ed to consider the present posture of its case and communicate any decision regarding these defendants to their counsel.

A full status conference will be held on September 16, 1988, at 11:00 A.M., at which time all counsel will appear. The court anticipates that each defense counsel will have communicated with each other and with counsel for Raymark as to the future of their prospective cases, including scheduling of discovery depositions. In the interest of proceeding further in an orderly way, defendants are well advised to select a lead counsel or a committee of three attorneys, including a liaison counsel.

IT IS ACCORDINGLY ORDERED this 10th day of August, 1988, that the motions of defendants Gerry and Stemple, and defendant Gelbard are denied, except that Count IV of the complaint is hereby dismissed.